Isaac JAROSLAWICZ and Joseph Jaroslawicz, Plaintiffs-Appellants,

v.

Albert A. SEEDMAN, Defendant-Appellee.

No. 338, Docket 75–7299.

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1975.

Decided Dec. 19, 1975.

---

Alfred S. Julien, New York City (Julien & Schlesinger, P. C., New York City, on the brief; Stuart A. Schlesinger, New York City, of counsel), for plaintiffs-appellants.

Bernard Burstein, New York City (W. Bernard Richland, Corp. Counsel, New York City, on the brief; L. Kevin Sheridan, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, and SMITH and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The writing of a book about one's life necessarily compels the author to avoid future adventures while recording and reflecting upon the old. When published, however, such a book may precipitate unanticipated adventures never contemplated or sought, as Albert A. Seedman discovered to his dismay.

While serving as Chief of Detectives of the New York City Police Department, Seedman assumed command of the investigation into a widely publicized 1971 sniper attack on the Soviet Mission to the United Nations. At his direction, a youth named Isaac Jaroslawicz was brought to the 19th Precinct for questioning. No state or local charges were lodged against the young man, and Seedman had no reason to anticipate any further direct or indirect dealing or contact with him. But the publication in 1974 of Seedman's autobiographical opus *Chief!*,[1] brought the youth back into Seedman's life. The book, described on its cover as "the riveting true story of a hardnosed New York detective who solved some of the most daring crimes of our time," became an instant bestseller. One interested reader was Isaac Jaroslawicz, who learned what he had long suspected: Seedman had been "under abnormal pressure to get results fast", *Id.* at 320, and seemed to indicate that Jaroslawicz was used to get "off the hot seat in the sniper case." *Id.* at 323.

Because of this, Isaac (and his father, Joseph Jaroslawicz) instituted this action seeking $3 million in actual and punitive

---

[1.] Albert A. Seedman & Peter Hellman, *Chief!* (1974). Seedman announces early in the book that "all the incidents in this book are true. . . . " The account is written in the third person, interspersed with frequent direct quotations from Seedman. Although the book spells the name "Jaroslowitz," the appellee has made no effort to deny that the references are to the same Jaroslawicz who has brought this lawsuit.

damages for violations of his civil rights, 42 U.S.C. §§ 1983, 1985, 1986. Judge Bruchhausen granted Seedman's motion for summary judgment and dismissed the complaint. Because there are genuine issues of material fact—created in large part by the disclosures in Seedman's book—we must reverse. In doing so we make no determination on the merits of this litigation or the ultimate interpretations to be placed on Seedman's words.

## I.

The facts underlying this appeal must be traversed in some detail to place the legal question in proper perspective. During the evening of October 20, 1971 four bullets shattered a bedroom window of the Soviet Mission to the United Nations on East 67th Street in Manhattan. Although the four children who had been sleeping in the room fortunately escaped unharmed, Soviet officials were understandably outraged. They promptly filed a complaint with the New York City Police Department and angrily denounced the United States for failing to curb the "Zionist hooligans" they felt were responsible. The United States Secretary of State, William Rogers, called the Soviet Ambassador in Washington within 75 minutes of the attack to apologize. And, late that night the United States Ambassador in Moscow was summoned to the Foreign Ministry and berated for the incident. The discussion at the United Nations the next morning was vituperative, and President Nixon's scheduled visit to Russia seemed in jeopardy.

Seedman was placed in charge of the investigation. His book concedes that "[u]nder the circumstances, Seedman was desperate for a quick face-saving break." Id. at 319. The police quickly discovered a .243 caliber Remington rifle at the bottom of an airshaft in the building across from the Soviet Mission. The serial number had been left on the weapon, and it was traced to a retail gun dealer on Long Island doing business as Charles Greenblatt, Inc. Seedman believed that a member of the Jewish Defense League ("JDL") might have been responsible for the shots. This group had been highly critical of Soviet treatment of Jews and had threatened violence against Russian diplomats in the United States if Soviet policy continued. Accordingly, Seedman directed some of his detectives to exhibit a photo album of JDL members to the employees of the gunshop, in the hope that they could identify the picture of the purchaser of the rifle from this array. Seedman apparently did not attend this photo-identification session, and he did not offer any affidavits from those detectives who were present in support of his motion for summary judgment. In his own affidavit he states, nevertheless, that two employees of the Greenblatt firm, Sol Jacobson (the vice president) and Kenneth Aull (a gunsmith who adjusted the telescopic sight on the rifle) selected two individuals from the photos as being the "possible purchaser" of the rifle. (Nor were any affidavits from Jacobson or Aull proffered in support of Seedman's motion for summary judgment.) One of the people selected, according to Seedman, was Isaac Jaroslawicz. The other was a JDL member named Lawrence Fine. There had been no eyewitnesses to the sniper attack, but Seedman apparently hoped that the gun purchaser could lead to the sniper (if, indeed, he was not the same person). Thus, Seedman ordered Jaroslawicz and Fine to be brought to the 19th Precinct for questioning.

Seedman suspected that the perpetrator of the attack might return to the scene of the crime, and he distributed copies of Jaroslawicz's photograph to patrolmen near the Soviet Mission. At about 5:30 p. m. on October 21, 1971, Jaroslawicz was spotted near the Mission. In an affidavit filed in opposition to Seedman's motion for summary judgment, Jaroslawicz claims that he was surrounded by five or six police officers, grabbed by both arms, and dragged toward the station house. He contends that his shouts and resistance proved fu-

tile, and that the police officers refused to answer his repeated requests to know whether he was under arrest and what the charge was. When the policemen's failure to respond continued at the 19th Precinct, Jaroslawicz contends, he sought to call his lawyer or to leave the station house. The appellant states that his requests were refused and that he was physically restrained from departing. The affidavit of Harvey Michelman, an attorney who arrived at the Precinct after hearing independently that some JDL members had been arrested, confirms this account. Although Seedman disagrees with this version of the facts, he conceded in his brief and at oral argument that the appellant's presence at the police station may have been involuntary.

While at the 19th Precinct, Jaroslawicz refused to answer the questions put to him by the police. At one point he was placed in a line-up, apparently with Fine and several police officers. The appellant, in his affidavit, insists that the line-up was unduly suggestive. Not only had Aull and Jacobson (who had been brought to the station house) been shown his photograph a few hours before, but the other participants in the line-up were all "much older" than he, Jaroslawicz claims. In any event, Seedman concedes that Jacobson selected one of the police officers as the purchaser of the rifle. Seedman was "dismayed," according to his book, and asked Jacobson, "What would you say right now if I told you your wife was in that line-up?" The gun salesman, who admitted his eyesight was poor, "looked from one man to the next, then went painstakingly back down the line. 'I don't think she's up there,' he said finally." *Id.* at 321. Aull had no such difficulty, according to Seedman, and selected Jaroslawicz without hesitation. Seedman did not, however, submit an affidavit from Aull attesting to this.

In his book (not in his affidavit) Seedman indicates that his instincts "made [him] uneasy" about treating the appellant as the perpetrator. *Id.* at 320. Jaroslawicz, Seedman's book states, simply did not look or act as though he was guilty of attempted murder. *Id.* Moreover, even after the line-up,

'. . . we had to decide what to do with Jaroslowitz [sic],' says Seedman. 'He had been identified as the purchaser of a rifle, but not as a sniper. We had no reason to accuse him of firing the shots and no evidence that he was part of a conspiracy that culminated in the shooting. He had not been discovered carrying a concealed weapon. In fact, he had done nothing to violate local or state law.'

*Id.* at 321. Seedman was undaunted by this. The purchaser of the Remington rifle had used a false name and a forged draft card in identifying himself at the time of the acquisition. Although not in contravention of state or local law, this constituted a federal crime. 18 U.S.C. §§ 922(a)(6); 924(a). Accordingly, Seedman summoned agents of the Division of Alcohol, Tobacco, and Firearms of the U. S. Treasury Department to make the formal arrest. Seedman's book recounts what transpired:

'But the ATF balked at arresting Jaroslowitz, contending that the case against him was hardly overwhelming. They had a point. Under normal circumstances I never would have ordered Jaroslowitz arrested so quickly. But with everyone anxious to see fast results, the gunsmith's identification would have to suffice. In the morning George Bush [then the U. S. Ambassador to the United Nations] could stand up at the UN and mollify the Russians by announcing that an arrest had already been made.'

*Id.* at 321–22. To overcome the recalcitrance of the federal agents, Seedman initiated a series of frantic phone calls between Bush, the United States Attorney General, and the local United States Attorney. Finally, at 4 a. m.—approximately 10 hours after Jaroslawicz had been brought to the station house—the federal arrest was consummated. Seedman, in *Chief!,* recalled that

'All that time, Burt Zweibon, lawyer for the JDL, was hollering that his

client was being railroaded to placate the Russians. I have heard lawyers yell louder for less reason. But with the President planning to visit Russia later in the year, I was not about to allow a dopey teen-ager from Brooklyn to cast a shadow on that event.' *Id.* at 322. Seedman continued to harbor doubts about Jaroslawicz:

'. . . [E]ven after the arraignment, I didn't have the right feeling about him in my gut. This fat, smiling, relaxed kid, who had appeared to be the only one enjoying himself during the long exhausting night we had him in custody, might have done some silly things, but he had the wrong look and wrong face for a sniper.

'Jaroslowitz's grandmother had come up with one small fact in his favor. She pointed out that Isaac never would have bought a gun on October eleventh. That was [a] minor Jewish holiday . . . .. Isaac, son of a rabbi and a genuinely religious kid who attended synagogue services every morning, had been in synagogue all day, she said. Of course, he could have taken time out to buy a gun at Greenblatt's, but I tended to doubt it. The kid was just giving me all the wrong signals.'

*Id.* at 324. Seedman, nevertheless, did nothing to prevent Jaroslawicz from being indicted on the federal firearm charges.[2] But, the indictment was not long lived for on February 1, 1972, both counts were dismissed on the motion of Assistant United States Attorney Korman of the Eastern District of New York. Another member of the JDL, Gary Shlian, had been determined to be the purchaser of the Remington through detective work described in Seedman's book. Shlian subsequently pleaded guilty to those charges. No one was ever arrested as the sniper, however.

## II.

Shored up by the admissions in *Chief!*, Jaroslawicz instituted this action in 1974, shortly after he reached the age of 21, seeking damages for violations of his civil rights. He alleged that Seedman had procured his arrest in bad faith and without reasonable cause to believe that he had committed any federal, state, or local crime. Judge Bruchhausen reviewed the affidavits submitted by each side in response to Seedman's motion pursuant to Fed.R.Civ.P. 12(b)(6) for an order dismissing the complaint or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. The district judge, treating the application as one for summary judgment, granted it and dismissed the complaint. He concluded that there was "no doubt that the defendant acted in good faith and that his belief was reasonable."

██ We disagree with the judge's concept of the parameters of a Rule 56 motion and, therefore, must reverse. Summary judgment cannot be sustained merely because the judge believes that the party against whom it is entered is unlikely to prevail on the merits after a trial. To be successful on a Rule 56 application, it must be established that there are no genuine issues of material fact. The responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself via affidavits. *Heyman v. Commerce & Industry Insur. Co.*, 524 F.2d 1317 (2d Cir. 1975); *see also Judge v. City of Buffalo*, 524 F.2d 1321 (2d Cir. 1975); *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967); *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir. 1971). Although it may become clear after a trial that Seedman employed nothing more than literary license in writing his book, the appellant's affidavit raises several genuine issues of material fact that must be resolved at a trial and not by the "drastic device" of summary judgment. *Heyman v. Commerce & Industry Insur. Co., supra*, at 1320.

---

**2.** Jaroslawicz was released after posting bond on October 22, 1971.

For example, one disputed factual question of crucial importance to be resolved is what precisely transpired when the police officers approached the appellant on the street and accompanied him to the 19th Precinct station house. Jaroslawicz asserts that he was dragged to the police station and forcibly detained there. If proven, this would seem to constitute an arrest or "seizure", requiring compliance with the Fourth Amendment. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such a seizure is, of course, improper, unless probable cause for the arrest[3] existed at the time it occurred. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

Seedman recognizes that he never possessed probable cause to have Jaroslawicz arrested on any state or local charge. Nor does he argue that there was probable cause on the federal charges until Aull selected Jaroslawicz from the lineup several hours *after* the youth was escorted to the police station. Seedman argues that the less demanding defense provided by *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and *Bivens v. Six Unknown Named Agents,* 456 F.2d 1339, 1348 (2d Cir. 1972) (on remand) would, in any case, save the day for him. In *Bivens,* this Court held that a police officer could prevail in such a suit[4] even if he cannot

> allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. . . . [W]e hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest . . . and in the necessity for carrying out the arrest . . . in the way the arrest was made . . . .

*Id.* at 1348. But, Seedman's own words have created an issue of fact concerning his good faith. Indeed, the affidavits offered in support of Seedman's motion failed to demonstrate the absence of a factual dispute regarding Seedman's "reasonable belief" at the time Jaroslawicz's detention commenced. Seedman was not competent to testify to the photo-identification at the gun shop for he was not present at the event, Fed.R. Civ.P. 56(e), and no affidavits were offered by Aull, Jacobson, or the detectives who were present.[5]

Accordingly, it was error to grant summary judgment to the defendant.[6]

Reversed.

---

**3.** The defense of "good faith and reasonable belief," as an alternative to "probable cause," is discussed *infra.*

**4.** This test applies to state and local officers sued for false arrest under § 1983. *Bivens, supra,* at 1347; *Pierson, supra,* 386 U.S. at 557, 87 S.Ct. 1213.

**5.** Although Seedman relates that ballistics tests determined that the .243 caliber Remington rifle was the weapon from which the shots were fired, it is not clear that he knew this at 5:30 p. m. on October 21, 1971 when Jaroslawicz was taken into custody. Seedman says only that the ballistics examination was completed "prior to Jaroslawicz's arrest." Throughout his papers Seedman, however, constantly insists that Jaroslawicz was not "arrested" until the federal agents preferred charges at 4 a. m. the following morning.

**6.** As indicated, reversal of the grant of summary judgment is compelled even if probable cause arose when the appellant was identified by Aull at the line-up. We note, however, that Jaroslawicz has raised genuine issues as well with respect to material facts contemporaneous with, and subsequent to, the line-up. For example, he claims that the line-up was unduly suggestive and that Seedman improperly instigated his arrest by the federal agents. These issues also are inappropriate for disposition on affidavits.