**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**ONE TINTORETTO PAINTING ENTITLED "THE HOLY FAMILY WITH SAINT CATHERINE AND HONORED DONOR," Defendant in Rem.**

**Isaac Silberberg, Claimant-Appellant.**

**No. 1268, Docket 82–6021.**

United States Court of Appeals, Second Circuit.

Argued June 10, 1982.

Decided Oct. 15, 1982.

Susan Millington Campbell, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S.D.N.Y., Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Allen Jay Bodner, New York City, for claimant-appellant.

Before FEINBERG, Chief Judge, CARDAMONE, Circuit Judge and SAND, District Judge.*

CARDAMONE, Circuit Judge:

We are called upon to decide a forfeiture case commenced by the United States of America against a painting entitled "The Holy Family with Saint Catherine and Honored Donor," as defendant *in rem.* Two hundred years or so before the plaintiff United States came into being, the defendant *in rem* was painted by the tempestuous Italian Renaissance painter Tintoretto.[1] Claiming that this valuable masterpiece was smuggled into the United States, the government instituted the instant forfeiture proceeding as a civil action *in rem* for failure to pay customs duties. Initiated by seizure of the painting, the action was instituted under the provisions of 18 U.S.C. § 545 and the Tariff Act of 1930, 19 U.S.C. § 1592 (the latter claim was later dropped). The government sought to enforce the for-

---

\* The Honorable Leonard B. Sand, District Court Judge for the Southern District of New York, sitting by designation.

1. Tintoretto's name was Jacopo Robusti. Because his father was a dyer or "tintore," he was called "Tintoretto" or little dyer. He lived his entire life (1518–1594) in Venice, Italy. He was, along with Titian and Veronese, one of the masters of the Venetian School during the period of the High Italian Renaissance. H. Tietze, *Tintoretto* (1948). There is some suggestion that the painting is not by Tintoretto, but by his son, Domenico. R. Palluchini and P. Rossi, *Le Opere Tintoretto Sacre e Profane* 378 Cat. 142 (Tomo Secondo 1982).

feiture in a proceeding which afforded the owner an opportunity to appear and be heard.

Once the painting was seized and a notice of attachment published, Issac Silberberg (claimant) asserted ownership of the Tintoretto painting and filed a verified answer. The government then moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment based upon the affidavits and statements filed. Relying on *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974), Judge Morris E. Lasker, United States District Court Judge for the Southern District of New York, granted the motion. 527 F.Supp. 1071. We believe, however, that the claimant raised a genuine issue of fact regarding the purported forfeiture which precludes summary judgment and entitles claimant to his day in court.

Claimant Silberberg, an Israeli national, stated that he purchased the painting without being aware of its authorship in a second-hand shop in Moscow in 1948 after his discharge from duty as an officer in the Soviet Army. Suspecting that the painting was valuable, he paid the equivalent of $20,000 in rubles. Upon moving to Vienna in 1975 and then to Tel Aviv in 1978, he openly displayed the painting in his home.[2] After owning the picture for over 30 years, Silberberg decided to sell it in 1979 due to financial needs. Finding there was no market in Israel, he entrusted the painting to Raymond Vinokur, a long-term social and business acquaintance. Vinokur dealt in objets d'art and told Silberberg that he was knowledgeable in the field of art. An arrangement was made between them for Vinokur to sell the picture in the United States on a commission basis.

Vinokur then engaged in the shady maneuvers that led to the arrest of the Tintoretto painting. Vinokur flew to New York on December 5, 1979 and falsely stated on his entry permit that he would be staying at the Barbizon Plaza Hotel in New York City, when in fact he intended to and did stay at the home of one Efin Nezhinsky in Queens, New York. On December 10, 1979 a package containing the Tintoretto arrived in the United States from Germany aboard a KLM flight which landed at John F. Kennedy International Airport (JFK) in New York.

During the preceding month of November 1979 the Federal Bureau of Investigation (FBI), acting on information from confidential sources, had begun an investigation regarding this painting. An FBI agent confirmed through experts the masterpiece's authenticity and the fact that it had been stolen from the Dresden Gallery of Art in East Germany at the close of World War II. The painting was thereafter reputed to have been taken to the Soviet Union in the possession of a Soviet General and later transported to Israel. On December 10 the agent was informed that Nezhinsky had picked up a package containing the Tintoretto at JFK. The customs forms which Nezhinsky completed and signed falsely stated that the Tintoretto was his personal property, for his own use, not for resale, and had a value of $500. Posing as an art dealer, the FBI agent subsequently met with Vinokur at a Madison Avenue Hotel, offered to purchase the painting, and asked Vinokur whether it could be resold. Upon informing the agent that the painting was marketable and that he would sell it to the agent for $250,000, Vinokur was arrested.

On January 22, 1980, Vinokur pled guilty to making false statements in a Customs Bureau document in violation of 18 U.S.C. § 542. As a result of Vinokur's conviction, the government obtained possession of the picture and, later in 1980, instituted this action.

## II

Forfeiture statutes, which derive from English common law principles, embody the concept that a forfeiture is abso-

---

**2.** The painting, which depicts the Holy Family, is large and dominated by deep, rich shades of red, brown, gold and black. The Venetian set-ting is inescapable—the Adriatic Sea forms a distant backdrop with a group of gondolas floating gently upon it.

lute. Thus, an owner's interest in the article may be forfeited even though the owner was not a participant in and had no knowledge of the illegal acts which brought about the forfeiture. *See Various Items of Personal Property v. United States,* 282 U.S. 577, 580–81, 51 S.Ct. 282, 283, 75 L.Ed. 558 (1931). At early common law the right of forfeiture normally did not arise until the offender had been convicted. *The Palmyra,* 25 U.S. (12 Wheat.) 1, 9, 6 L.Ed. 531 (1827). This doctrine was discarded in an early Supreme Court case which pointed out that the "doctrine never was applied to seizures and forfeitures created by statute, *in rem,* cognisable on the revenue side of the exchequer. The thing is here primarily considered as the offender, or rather the offence is primarily attached to the thing . . . ." *Id.* Once the offense attaches to the inanimate thing, it is without regard to the personal misconduct of its owner. *See J. W. Goldsmith, Jr.-Grant Co. v. United States,* 254 U.S. 505, 510–13, 41 S.Ct. 189, 190–91, 65 L.Ed. 376 (1921). The underlying rationale for this principle is a legal fiction dating back several thousand years based on the apocryphal notion that "it" is the inanimate object, not its possessor or owner, which offends against the law.[3] While this action may be one that is quasi-criminal, *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965), it is a separate and distinct proceeding from the criminal proceeding against the offending person (here Vinokur) and forfeiture is "no part of the punishment for the criminal offense," *Various Items of Personal Property,* 282 U.S. at 581, 51 S.Ct. at 283 (citation omitted).

### III

The sole issue before us is whether there was a proper award of summary judgment for the government based upon its complaint seeking a forfeiture of the subject painting.

The standard under which a summary judgment motion is tested requires a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden rests on the moving party to demonstrate the lack of genuine fact issue. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In its search of the record the court should resolve all ambiguities and inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980). The possibility that a factual issue *may* exist will not defeat the motion, rather the party opposing summary judgment must indicate that a genuine dispute as to a material fact *does* exist. Uncertainty as to the true state of any material fact defeats the motion. *Quinn,* 613 F.2d at 445.

In passing upon a Rule 56 motion the district court must determine whether there are issues of fact to be tried. *Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir. 1975); *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975). It cannot try such issues by opposing affidavits, *id.,* because it is impossible to foresee how the facts may evolve at trial. Stated another way, the key is issue-finding, not issue-resolution.

### IV

The government argues that it has long been the rule that the owner's innocence is

---

**3.** Holmes traces this notion back to the Old Testament (Exodus), then to the Greeks and later to the Romans whom he notes questioned the view that held "things devoid of life" to be capable of fault. O. Holmes, Jr., *The Common Law* 7–9 (1881). Later this ancient fiction was repeated by Blackstone, *id.* at 7, and is carried by present day law to the point where, after a complaint was filed by the government in this case, a warrant was sworn out by the Clerk of the District Court for the Southern District of New York in the name of the President of the United States directed to the Federal Marshall for the *arrest* of the Tintoretto painting. *See* Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims (1970).

no defense to a claim of forfeiture, *Goldsmith-Grant,* 254 U.S. at 510–13, 41 S.Ct. at 190–91. An exception may exist—the *only* exception says the government—where the object is stolen or taken from the owner without his consent. *See Van Oster v. Kansas,* 272 U.S. 465, 467, 47 S.Ct. 133, 134, 71 L.Ed. 354 (1926). Thus, the government contends that since this painting was freely transferred from claimant Silberberg to Vinokur, a forfeiture works no deprivation of Silberberg's due process rights under the Fifth Amendment. *See id.* at 467–68, 47 S.Ct. at 134. We disagree.

■ In our view the claimant arguably fits within a second exception which the Supreme Court voiced in dicta in *Calero-Toledo v. Pearson Yacht Leasing Company,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452. In *Calero* police found marijuana aboard a yacht that had been leased by its owners. Although the owners had no involvement in or knowledge of the lessee's wrongful use of the boat, the vessel was forfeited. In sustaining that determination the Supreme Court noted the one exception upon which all parties agree: "it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent." *Id.* at 689, 94 S.Ct. at 2094 (citations omitted). Immediately thereafter, the Court continued by stating:

Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for, in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive.

*Id.* at 689–90, 94 S.Ct. at 2094–95 (footnote and citation omitted).

Although merely dicta, the second exception suggested in *Calero* is in accord with the policy and history of civil forfeiture in this country. Recognizing the broad sweep of the forfeiture statutes, the Supreme Court has stated that when "viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise." *United States v. United States Coin & Currency,* 401 U.S. 715, 721–22, 91 S.Ct. 1041, 1044–45, 28 L.Ed.2d 434 (1971) (footnote omitted). The history of forfeiture clearly demonstrates that its principal purpose was to protect government revenues, not to impose punishment without fault on those who are acting "in good faith and without negligence," *United States v. One 1936 Model Ford V–8 DeLuxe Coach,* 307 U.S. 219, 236, 59 S.Ct. 861, 869, 83 L.Ed. 1249 (1939). Thus as Chief Justice Marshall once observed: "a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed." *Peisch v. Ware,* 8 U.S. (4 Cranch) 208, 217 (1808).

■ Given the existence of the second exception, we must next determine whether Silberberg has raised a sufficient issue of fact as to whether he falls within its purview. The affidavits from Vinokur, Silberberg and others at least raise an arguable claim that Silberberg was not involved in or aware of the smuggling of his painting into the United States. His innocence, even assuming it to be a fact, standing alone, is not enough. Silberberg must present evidence, absent in *Calero,* that he did all that "reasonably could be expected," 416 U.S. at 689, 94 S.Ct. at 2094, to prevent this illegal act involving property he claims as his own.

In support of his contention that he met this requirement, Silberberg states in an affidavit that he first met Vinokur socially in Tel Aviv in 1975 and thereafter dealt with him in business. He entrusted Vinokur with the sale of the painting because he knew Vinokur personally and because Vinokur enjoyed a good reputation in the Tel Aviv business community. Vinokur had, to the best of Silberberg's knowledge, never been charged with any crime. Silberberg swears that he was assured by Vinokur that all precautions would be taken with the painting including conforming to customs regulations, paying any duties if required, and properly packing the painting to pre-

vent damage. All of this was at Vinokur's expense to be reimbursed by Silberberg when the picture was sold. In fact Silberberg contracted to reimburse Vinokur for any duties that had to be paid. By entering into this reimbursement agreement, Silberberg arguably did all that reasonably could be expected of him to avoid the proscribed use of his property. *Cf. Peisch*, 8 U.S. at 217–18 (property owner does not forfeit where goods were entrusted to others whose misconduct led to customs seizure and where owner could have no control over the others' misconduct). Lending support to claimant's argument is the fact that Vinokur, in an affidavit, substantially corroborates the facts with respect to the arrangement between them recited in the Silberberg affidavit.

We think that claimant Silberberg is entitled to his day in court because the recitation in these affidavits raises sufficient factual issues to preclude the granting of summary judgment for the government. To rule otherwise would be difficult to justify, for the forfeiture would simply be an arbitrary act, serving no legitimate government interest, oppressive and harsh, and in our view contrary to the Fifth Amendment. *See Calero*, 416 U.S. at 689–90, 94 S.Ct. at 2094–95.

## V

The government urges us to reject Silberberg's argument that he be granted a trial because he failed to avail himself first of the existing administrative remedy for remission or mitigation of forfeiture arising from the customs law under 19 U.S.C. § 1618. It argues that courts have no power to grant remission or mitigation and that the administrative remedy is the sole relief provided to ameliorate the harshness of forfeiture for the allegedly innocent owner of property. This position finds no support in the statute and regulations.

Turning first to the statute it provides that:

> Whenever any person interested in any ... merchandise ... seized under the provisions of this chapter, or who has incurred ... any fine or penalty thereunder ... files with the Secretary of the Treasury under the customs laws ... a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary ... may remit or mitigate the same upon such terms and conditions as he deems reasonable and just ....

19 U.S.C. § 1618 (1976). No mandatory "shall" or "must" language is contained in this section. As the statutory scheme and regulations for protesting a proposed forfeiture make clear, every property owner has a right to assert his claim in court. Concededly the procedures for levying fines, penalties or securing forfeitures for violations of the customs law differ depending on the value of the contraband involved, but regardless of value, judicial relief is available.

In cases where the value of the property does not exceed $10,000[4] the law permits summary seizure. 19 U.S.C. § 1607 (1976 & Supp. IV 1980); *see also* 19 C.F.R. § 162.45 (1981). The reason for this time-honored method is that it is simply a practical means for speedily disposing of goods subject to forfeiture whose value is small. *See Conway v. Stannard*, 84 U.S. (17 Wall.) 398, 404, 21 L.Ed. 649 (1873). If no petition for relief from the forfeiture is later made to the Secretary of the Treasury, the property is disposed of. 19 U.S.C. § 1609 (1976); 19 C.F.R. § 162.46(a) (1981).[5] But if any person desires the seized property he may file a claim and post a bond with the district director of customs in order to stop summary forfeiture proceedings. 19 U.S.C. § 1608 (1976); 19 C.F.R. § 162.47 (1981). Thus, in this $10,000 or less category remission or mitigation is available through an administrative proceeding, unless a claim is filed and a bond posted, in which case the claimant may assert his rights in court.

---

4. The law requires that seized property be appraised as described in 19 U.S.C. § 1606 (1976) and 19 C.F.R. § 162.43(a) (1981).

5. Meanwhile the seized merchandise remains in the custody "of the appropriate customs officer for the district in which the seizure was made to await disposition according to law." 19 U.S.C. § 1605 (1976).

When the value of seized merchandise, as here, is more than $10,000 a different procedure is followed. The district director has no right to summary forfeiture, but rather files a report with the United States Attorney for the district where the property was seized. 19 U.S.C. § 1610 (1976 & Supp. IV 1980). The United States Attorney then institutes a forfeiture proceeding in the United States District Court, 19 U.S.C. § 1604 (1976), and the seized property comes directly under the jurisdiction of the district court whose decision governs its disposition.

▮ A claimant such as Silberberg may elect to petition the Secretary for remission only if he expressly agrees to defer judicial proceedings. *See* 19 C.F.R. § 171.-11(d) (1981). Obviously where, as here, he chooses not to seek administrative relief, his rights in the property are to be determined in the district court proceeding. The footnote in *Calero* relied upon by the government, 416 U.S. at 689–90 n. 27, 94 S.Ct. at 2095, n. 27, is not to the contrary. It simply discusses the standards employed in the regulations for determining applications for remissions. Interestingly, the government argued before the Tenth Circuit in a case where the claimants had filed petitions for administrative relief that "utilization of the administrative process is *voluntary* on the part of the individual claiming an interest in the seized property." *White v. Acree,* 594 F.2d 1385, 1388 (10th Cir. 1979) (emphasis supplied).

▮ In addition to the clear intent of the statute and regulations that the administrative remedy of mitigation and remission is one voluntarily sought, we do not believe that the district court's jurisdiction to review a Fifth Amendment claim of constitutional deprivation may be entirely precluded regardless of the fact that an administrative remedy does exist.

Accordingly, we reverse the order granting summary judgment and remand the case for trial on the issue of forfeiture of the Tintoretto painting.