**IBM POUGHKEEPSIE EMPLOYEES FEDERAL CREDIT UNION, Plaintiff,**

v.

**CUMIS INSURANCE SOCIETY, INC. and Professional Asset Management, Inc., Defendants.**

**No. 83 Civ. 5353.**

United States District Court, S.D. New York.

July 3, 1984.

Quartararo & Quartararo, Poughkeepsie, N.Y., for plaintiff; Jack M. Quartararo, Poughkeepsie, N.Y., of counsel.

Hart & Hume, New York City, for defendant Cumis Ins. Soc., Inc.; Lewis Stockman, Mark S. Gamell, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, a federally chartered credit union located at Poughkeepsie, New York, commenced this action against Cumis Insurance Society ("Cumis"), which had issued to plaintiff a "Credit Union Discovery Bond" ("the policy"), indemnifying plaintiff against certain specified losses. Plaintiff seeks by this action to recover a loss it sustained when Penn Square Bank of Oklahoma City, Oklahoma ("Penn Square"), which had issued certificates of deposit to plaintiff, failed. Cumis moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that the undisputed facts show that the loss is not covered by the policy.

Plaintiff invested in the certificates of deposit ("CDs") based upon information received from Professional Asset Management, Inc. ("PAM"), an investment consulting firm located at Woodland Hills, California. The factual underpinnings of the relationship between plaintiff and PAM are not in dispute. PAM, a self-styled money broker, solicits funds for investment in various banks and savings and loan institutions, primarily through certificates of deposit. PAM is paid a fee by the institution which issues the certificate of deposit. PAM employs marketing and public relations techniques such as promotional mailings, reports, newsletters and symposia to inform credit unions about investment opportunities in banks and savings and loans throughout the nation.

Early in 1981, plaintiff began receiving complimentary copies of PAM's "Capital Adequacy Reports" and its newsletter to "Clients and Friends," which contained PAM's recommendations for investments in various banking institutions. Plaintiff also received a document entitled "The P.A.M. Pledge," which stated that before placing a bank or savings and loan association on its recommended list, PAM performed a "five-year trend analysis of capital adequacy and performance ... review[ed] actual annual financials, 10k's, 10Q's ... and the auditor's opinions of the annual reports ... [as well as] documents required by Federal regulatory agencies of each institution ... monitor[ed] widely read business and trade publications ... [and reviewed the institution's response to PAM's] own carefully designed financial questionnaire."

In mid-1981, PAM placed Penn Square on its list of recommended investments. Thereafter, in December, 1981, plaintiff invested $500,000 in a sixty-day certificate of deposit from Penn Square. Plaintiff renewed that certificate, and subsequently increased its investments, so that by July 5, 1982, plaintiff had a total of $3,000,000 invested in three certificates of deposit issued by Penn Square. In making its investments, plaintiff dealt directly with Penn Square and did not use PAM as an intermediary.

On July 5, 1982, Penn Square was closed by the Comptroller of the Currency by reason of its insolvency. To date, plaintiff has recovered only approximately $700,000 of its $3,000,000 investment ($100,000 was insured by the Federal Deposit Insurance Corporation ("FDIC"), which is also the receiver, and $594,506 has been paid by the receiver as a partial dividend). Plaintiff filed a claim with Cumis for $2,378,025, the unpaid balance of principal and interest due under the CDs issued by Penn Square, asserting that the loss comes within the indemnification provisions of the policy issued by defendant to plaintiff. Defendant rejected the claim, and plaintiff commenced this action to recover the loss.

Plaintiff's complaint sets forth three claims against Cumis. In the first and second claims, plaintiff alleges that PAM and Penn Square were employees of plaintiff, that the loss was occasioned by the fraud and misrepresentation of those employees, and that it therefore comes within Clause A of the policy:

This bond provides coverage[:] A. For direct loss of, or damage to, any property, as defined herein, caused by the fraud or dishonesty of any of the Insured's employees, as herein defined, and directors, committed anywhere, whether acting alone or in collusion with others, or through the failure on the part of such employee, excluding directors acting as directors except for fraud or dishonesty, to well and faithfully perform his duties.

In the third claim, plaintiff alleges that its loss was the result of "burglary, larceny, misplacement or mysterious unexplained disappearance" of plaintiff's property while it was on deposit on the premises of Penn Square, and therefore comes within Clause B of the policy:

This bond provides coverage [:] ... B. For direct loss of any property, as defined herein, through burglary, robbery, larceny (whether common-law or statutory), theft, holdup, misplacement, mysterious unexplainable disappearance, damage or destruction, including damage or destruction by fire of property as defined herein, while such property is within the premises as defined herein.

Defendant moves for summary judgment dismissing each of the three claims. It argues that the undisputed facts show that neither PAM nor Penn Square were "employees" of plaintiff, as that term is defined in the policy. Further, it asserts that the plaintiff's investment in Penn Square's CDs was in the nature of a loan, and that the policy's loan exclusion provision therefore applies. Finally, defendant argues that the funds on deposit with Penn Square were not plaintiff's property, and therefore their loss is not covered by the policy.

Summary judgment under Fed.R. Civ.P. 56 is a "drastic device"[1]—one that our Court of Appeals has applied rigidly and "with some timidity" to insure that a litigant is not deprived of the right to a jury trial.[2] At the same time, however, our Court of Appeals has recognized that, "properly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation."[3] On a motion for summary judgment, "the court cannot try issues of fact; it can only determine whether there are issues to be tried."[4] The moving party has the burden of proving "the absence of any material factual issue genuinely in dispute,"[5] and the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom

---

1. *Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir.1975) (*quoting Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975)).

2. *Applegate v. Top Assocs., Inc.,* 425 F.2d 92, 96 (2d Cir.1970).

3. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

4. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983) (*quoting Heyman,* 524 F.2d at 1320); *see also Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238 at 244 (2d Cir.1984).

5. *Schering Corp.,* 712 F.2d at 9; *Quinn,* 613 F.2d at 444; *Heyman,* 524 F.2d at 1320 (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

summary judgment is sought." [6] However, the opposing party "may not rest upon mere conclusory allegations or denials," but must instead set forth "supporting arguments or facts in opposition to the motion" [7] and "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." [8]

When applied to a breach of contract action, these principles "require that where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting. Summary judgment is perforce improper if conflicting evidence is adduced." [9] Contracts of insurance, like other contracts, are to be construed to effectuate the parties' intent as expressed by the words the parties used, and if the terms of the contract are clear and unambiguous, the Court must enforce the plain, ordinary and common meaning of those terms.[10] Accordingly, the Court first must determine as a matter of law whether the terms of the contract are ambiguous.[11] If the contract is ambiguous, and if the opposing party proffers a reasonable interpretation and submits supporting extrinsic evidence over which there is a genuine dispute, summary judgment is precluded.[12]

The policy defines employees as:

Officers, clerks, collectors, messengers, persons in similar positions, ... members of the credit committee, supervisory committee, and similar committees of the Insured, all other persons in the immediate employ of the Insured and directors of the Insured, while such directors are performing acts coming within the scope of the usual duties of any of the foregoing, and attorneys at law of the Insured elected or appointed or retained by it. Employee as used in this Bond shall include any person coming within the foregoing definition, even though not under a contract of hire with the Insured.

... Each natural person, partnership or corporation appointed by the Insured to maintain the accounting records of the Insured or data processor of checks, to act as its agent in the capacity of electronic data or microfilming processor of checks or other accounting records of the Insured or in which the Insured has an interest.

The definition is not ambiguous: upon its face, it does not extend to PAM, the money broker, or Penn Square, the bank issuing the CDs. Further, neither PAM nor Penn Square comes within the commonly accepted and traditional meaning of the word "employee"—"a person working for another person or business firm for pay." [13] It is undisputed that neither received any wage, salary, commission or fee from plaintiff. Plaintiff does not allege that either was subject to plaintiff's direction or con-

**6.** *Schering Corp.*, 712 F.2d at 9; *Heyman*, 524 F.2d at 1320.

**7.** *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978); *see also Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983); *Schering Corp.*, 712 F.2d at 9.

**8.** *Quinn*, 613 F.2d at 445.

**9.** *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983); *Home Ins. Co. v. Aetna Casualty and Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976); *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975).

**10.** *American Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485, 1492 (S.D.N.Y.1983); *Coppotelli v. Insurance Co. of North America*, 484 F.Supp. 1327, 1329 (E.D.N.Y.), *aff'd in part*, *rev'd in part on other grounds*, 631 F.2d 146 (2d Cir.1980).

**11.** *Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980).

**12.** *Schering Corp.*, 712 F.2d at 9; *Heyman*, 524 F.2d at 1320; *Emons Indus., Inc. v. Liberty Mut. Fire Ins. Co.*, 567 F.Supp. 335, 338 (S.D.N.Y. 1983); *Mallad Constr. Corp. v. County Fed. Sav. & Loan*, 32 N.Y.2d 285, 290, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96, 99 (1973).

**13.** The American College Dictionary 394 (1970); *see also* Webster's New International Dictionary of the English Language 839 (2d ed. 1950) ("Employee: One employed by another; one who works for wages or salary in the service of an employer.")

trol.[14] Indeed, plaintiff fails to set forth a single evidentiary fact about its relationship with PAM or Penn Square that even faintly resembles the normal indicia of an employment relationship.[15]

Plaintiff seeks to create an ambiguity by arguing that the word "employ" in the phrase "immediate employ" is not defined, and therefore must be read to mean "to engage in one's service," [16] or "to make use of; to use or engage the services of." [17] Plaintiff asserts that it made use of PAM's services by relying upon PAM's investment advice, and made use of Penn Square apparently by investing in its CDs. Plaintiff's strained construction does violence to the plain meaning of the terms "employee" and "in the immediate employ" and is patently unreasonable.

Plaintiff also stresses the definition's inclusion of attorneys, who often more closely resemble independent contractors than employees. However, plaintiff has not submitted the slightest proof that it ever retained, engaged, or contracted with PAM or Penn Square to render any service to plaintiff, or that its relationship with PAM or Penn Square bore any other hallmark of an independent contractor relationship.[18] In addition, the fact that the definition specifically includes attorneys, and in the next paragraph makes a special provision for accounting firms and data processors, is clear notice that other independent contractors are excluded.[19]

In short, the undisputed facts show only that PAM promoted Penn Square's CDs through correspondence and public relations campaigns, and that plaintiff was an audience to those promotions. The most telling evidence of the nature of their relationship is the testimony of William Sayres, plaintiff's general manager, in hearings before a Congressional Committee regarding the Penn Square failure:

Q: What do you pay for PAM's service, Mr. Sayres?

A: We don't pay PAM, sir.

Q: You don't pay them. In other words, they just distributed this free, is that right?

A: They are just an investment adviser to us.

---

**14.** In interpreting the definition of employee in a similar fidelity bond, the Sixth Circuit has stated that the principal test of an employer and employee relationship is control. *Third Fed. Sav. & Loan Ass'n of Cleveland v. Fireman's Fund Ins. Co.,* 548 F.2d 166, 170 (6th Cir.1977); *William H. Sill Mortgages, Inc. v. Ohio Casualty Ins. Co.,* 412 F.2d 341, 344 (6th Cir.1969). While those decisions applied Ohio and Michigan law, respectively, New York law similarly stresses control as a significant factor in determining whether an employment relationship exists. *See, e.g., Villa Maria Institute of Music v. Ross,* 54 N.Y.2d 691, 442 N.Y.S.2d 972, 426 N.E.2d 466 (1981).

**15.** *See, e.g., Third Fed. Sav. & Loan Ass'n,* 548 F.2d at 169. (In deciding whether a person was an employee as defined in a fidelity bond, the Court considered evidence regarding how person was paid, whether the insured withheld income taxes from payments, whether the insured made Social Security employee contributions on person's behalf, whether person was entitled to fringe benefits, whether insured paid expenses incurred in the work, and whether person had specific working hours). *Cf. Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C.Cir. 1979) (In determining whether a person is an employee for purposes of Title VII of the Civil

Rights Act of 1964, Court should examine the extent of the alleged employer's right to control the *means and manner* of the person's performance, whether the "employer" or the individual in question furnishes the equipment used or place of work, the method of payment, the manner in which the relationship may be terminated, whether annual leave is afforded, and whether the "employer" pays Social Security taxes or provides fringe benefits to the individual).

**16.** Black's Law Dictionary 617 (4th ed. 1968).

**17.** Webster's Seventh New Collegiate Dictionary 271 (1970).

**18.** Plaintiff does not allege, for example, that PAM provided information to plaintiff beyond that which it provided generally to all credit unions. Nor does plaintiff allege that PAM was entrusted with any confidential information about plaintiff, as an independent contractor such as an attorney, accountant, or data processor often is.

**19.** Under the doctrine of *expressio unius est exclusio alterius,* when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred.

Q: That is just a fancy name for their being out and selling these particular CS's, is that right? I mean in other words, they advise you but they really are not representing you. What liability do they have in terms of, or responsibility do they have in this particular case?

A: None.

Q: Their advice includes entertainment, speaking engagements, inviting you to various activities, is that right, to try and get across their message, is that an accurate description?

A: That is very possible, yes.

.    .    .    .    .

Q: ... But as far as what they are up to, they are trying to sell these CD's for these customers, are they not?

A: That is right, they are, yes, sir.

Q: So you know when you are dealing with an institution or money broker like that you have to be careful, don't you?

A: Absolutely ... we did our own evaluation of Penn Square. Evaluated the annual reports and financial statements we had on hand. We did not rely on the information provided by PAM.[20]

The fallacy of plaintiff's contention that its relationship with PAM and Penn Square was one of employment is further illustrated by the fact that under plaintiff's interpretation of the policy PAM, which circulated its promotional literature to practically all credit unions in the United States, would qualify as an employee of each one that used the literature in making its investment decisions. Further, plaintiff's

construction of "employee" would reach any publisher of a magazine, newspaper, or newsletter whose information proved useful to plaintiff in its investment decisions. Any financial institution that urged the desirability of a particular investment by an advertisement in the New York Times, Wall Street Journal, or Forbes also would become plaintiff's employee if plaintiff found the advertisement persuasive and acted upon it. All those banking institutions which plaintiff has "used" in depositing or investing its money also would be plaintiff's employees under its construction of the policy. Insurance contracts must be read as a whole and construed in a fair and reasonable manner with regard to the risk and subject matter and purpose of the policy.[21] The primary purpose of the policy here is to insure against the embezzlement of employees, burglary, robbery, forgery, and other such crimes. It does not guarantee that all plaintiff's transactions will be profitable.

The Court is not unmindful of the stringent standards applied when summary judgment is sought in a dispute over the meaning of a contract. As noted above, our Court of Appeals repeatedly has held that summary judgment is improper when "the disputed language ... is ambiguous, ... supports the fairly reasonable interpretation of both sides, and ... creates a genuine issue of material fact regarding the intent of the parties at the time the ... [a]greement was contracted."[22] Here, however, the language of the policy clearly and unambiguously does not include organizations such as PAM or institutions such as Penn Square within the definition of

**20.** *Penn Square Bank Failure: Hearings Before the House Comm. on Banking, Finance and Urban Affairs,* 97th Cong., 2d Sess. 387–88 (1982) (testimony of William J. Sayres). Plaintiff attempts to counter the effect of Mr. Sayres' testimony by pointing to the testimony of William Goldsmith, the Executive Vice-President of PAM, who stated that PAM "firmly believe[s] that our client is the investor, not the bank who pays us." *Id.* at 416 (Testimony of William Goldsmith). Mr. Goldsmith did not state that he considered PAM an employee of plaintiff, however, and PAM's self-serving view of its role

in the marketplace is not dispositive of the question whether plaintiff's attempt to style PAM as an employee is reasonable.

**21.** *Loblaw, Inc. v. Employers' Liability Assurance Corp.,* 85 A.D.2d 880, 446 N.Y.S.2d 743 (4th Dep't 1981), *aff'd,* 57 N.Y.2d 872, 456 N.Y.S.2d 40, 442 N.E.2d 438 (1982); *DeForte v. Allstate Ins. Co.,* 81 A.D.2d 465, 442 N.Y.S.2d 307 (4th Dep't 1981).

**22.** *Grand Union Co. v. Cord Meyer Dev. Corp.,* 735 F.2d 714 at 717 (2d Cir.1984).

employees. Further, even if the language were ambiguous, the interpretation proffered by plaintiff is simply fanciful, and has no basis in logic or reason. Thus, unless the summary judgment rule is to be a "dead letter," [23] defendant's motion as to the plaintiff's first and second claims must be granted.

■ Plaintiff's third claim seeks indemnity for the loss under Insuring Clause B, which covers the direct loss or property "through burglary, robbery, larceny ... theft, holdup, misplacement, [or] mysterious unexplainable disappearance ...." Defendant first seeks to avoid coverage by invoking the policy's exclusion of any loss:

> ... as the result of the complete or partial nonpayment of or default upon, any loan or transaction in the nature of, or amounting to, a loan ... except as it may be covered by Insuring Clauses A [fraud or dishonesty of an employee] or F [forgery or alteration of an instrument].

Defendant argues that a certificate of deposit is a loan, or is in the nature of a loan. Plaintiff claims that its relationship with Penn Square was that of a depositor, not a lender, and submits a letter from the Federal Deposit Insurance Corp. referring to the CD as a "deposit." Plaintiff's counsel also points to statutory and regulatory prohibitions on credit unions making loans to

banks as evidence that the loan exclusion does not apply to CDs.

Our Court of Appeals has defined a loan as "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows." [24] A CD is a "written acknowledgement by a bank of the receipt of a sum of money on deposit which it promises to pay to the depositor ... whereby the relation of debtor and creditor between the bank and depositor is created." [25] The two obviously are quite similar. Indeed, "it is generally held that a general deposit of money in a bank is nothing but a loan of money by the depositor to the bank." [26] The Supreme Court has stated that "the deposit of money by a customer with his banker is one of loan ..." [27] and has referred to general bank deposits as those "in which the depositor for his own convenience, parts with the title to his money, and loans it to the banker; and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount or any part thereof, on demand." [28] The New York Courts have stated that a certificate of deposit "is in effect a loan to a bank by the depositor for an agreed period of time at a stated rate of interest." [29] Numerous courts have stated that a certificate of deposit is in effect a promissory note—the term usually used to refer to documents evidencing a loan.[30] In addition, de-

23. *Meinrath v. Singer Co.,* 482 F.Supp. 457, 460 (S.D.N.Y.1979), *aff'd,* 697 F.2d 293 (2d Cir.1982).

24. *In re Grand Union Co.,* 219 F. 353, 356 (2d Cir.1914), *cert. denied, Hamilton Investment Co. v. Irving Ernst,* 238 U.S. 626, 35 S.Ct. 664, 59 L.Ed. 1495 (1915); *see also Calcasieu-Marine Nat'l Bank of Lake Charles v. American Employers' Ins. Co.,* 533 F.2d 290, 296–97 (5th Cir.), *cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).*

25. *Atkinson v. Federal Deposit Ins. Corp.,* 635 F.2d 508, 511 (5th Cir.1981); 5B Michie, *Banks and Banking,* § 313 (1983); *see also* U.C.C. § 3–104(2)(c) (1977) ("A writing which complies with the requirements of this section is (c) a 'certificate of deposit' if it is an acknowledgment by a bank of receipt of money with an engagement to repay it.").

26. 5A Michie, *Banks and Banking* § 4a (1983) and cases cited therein.

27. *Davis v. Elmira Sav. Bank,* 161 U.S. 275, 288, 16 S.Ct. 502, 505, 40 L.Ed. 700 (1896).

28. *Marine Bank v. Fulton Bank,* 69 U.S. 252, 256, 17 L.Ed. 785 (1865); *see also Bank of Marin v. England,* 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *New York County Nat'l Bank v. Massey,* 192 U.S. 138, 145, 24 S.Ct. 199, 200, 48 L.Ed. 380 (1904).

29. *Murray Director Affiliates v. Laventman,* 70 Misc.2d 571, 571, 334 N.Y.S.2d 192, 193 (N.Y. Civ.Ct.1972); *see also* 5B Michie, *Banks and Banking* § 313 (1983).

30. 5B Michie, *Banks and Banking* § 313 (1983) and cases cited therein; *see also* U.C.C. § 3–104(2) (1977).

fendant has submitted several publications from the credit union industry referring to certificates of deposit as loans.[31]

Plaintiff attempts to overcome the force of those authorities by arguing that "[a] certificate of deposit differs from a commercial loan in that it is considered a deposit as defined by the Banking Law." That argument begs the question. As the authorities cited above indicate, a bank deposit is, in effect, a loan. The policy here excludes not only losses resulting from a loan, but also those resulting from any "transaction in the nature of, or amounting to, a loan." Plaintiff's characterization of the CDs as a deposit therefore tends to prove, rather than disprove, that the CDs were in the nature of, or amounting to, a loan. Further, while even demand deposits such as checking accounts are recognized as essentially loans,[32] the argument that certificates of deposit are loans is even stronger, because the owner of a CD is not entitled to its proceeds prior to the specified maturity date.[33] Thus, while a demand deposit has been referred to as "merely a convenient means of holding ... [funds] for one's own use," [34] a CD evidences the investor's "intention to place the funds at the borrower's disposal" for a specified time—an essential characteristic of a loan.[35]

Plaintiff also asserts that the CDs cannot be considered loans because credit unions are not authorized to make loans to other banking institutions, but only to make deposits in banks.[36] Plaintiff notes, as well, various differences between loans and deposits, such as the type of supporting documents used for each.[37] Again, however, those arguments do not address the fact that deposits are in effect loans, and that the policy covers not only loans but transactions in the nature of loans. In short, plaintiff's efforts to escape the effect of the loan exclusion clause are completely unpersuasive, and fly in the face of substantial contrary authority. Further, even if plaintiff's construction of the clause could be considered sufficiently reasonable to warrant consideration of extrinsic evidence, plaintiff has offered no such evidence—its affidavits conspicuously omit any discussion of the plaintiff's intent in accepting the loan exclusion clause.[38]

[redacted] A separate flaw in plaintiff's theory of recovery also requires summary judgment of plaintiff's third claim. Defendant correctly contends that the loss of the funds on deposit at Penn Square [39] was not covered by the policy because the funds were the property of Penn Square, not plaintiff, and plaintiff's property, the indebtedness of Penn Square to plaintiff evidenced by the CDs, was not lost. Once plaintiff deposited its money with Penn Square, it no longer owned that money, but instead owned "the indebtedness of the

31. Goldsmith, An Investment Manual for Credit Unions 5, for example, states: "A CD (in excess of $100,000) is an unsecured deposit (or loan) to an institution supported only by the full faith and credit of the issuer and the buyer relies solely on the issuer's ability to repay principal and interest at maturity." Similarly, the National Credit Union Administration *Letter to Credit Unions* 54 (March 26, 1981) states: "Investments above insured amounts represent a real credit risk just like a loan to a natural person member."

32. *Supra* note 26.

33. The contract between the bank and the holder of the CD may provide that the holder may demand payment prior to maturity at a penalty, such as forfeiture of interest.

34. *Midland Ins. Co. v. Friedgood,* 577 F.Supp. 1407, 1413 (S.D.N.Y.1984); *Brigham v. McCabe,* 20 N.Y.2d 525, 285 N.Y.S.2d 294, 232 N.E.2d 327 (1967).

35. *See Brigham v. McCabe,* 20 N.Y.2d 525, 285 N.Y.S.2d 294, 232 N.E.2d 327 (1967).

36. *Id.;* 12 U.S.C.A. § 1757 (1980 & Supp.1983).

37. *See Schumacher v. Eastern Bank & Trust Co.,* 52 F.2d 925, 926–27 (4th Cir.1931).

38. *Supra* note 12.

39. For the purposes of this motion, defendant assumes, without conceding, that Penn Square qualifies as the plaintiff's "premises" under the policy.

bank to it, a mere chose in action." [40] Whatever disappeared or was taken or misplaced from the premises of Penn Square belonged to Penn Square, and while Penn Square's loss may affect its ability to pay its debt to plaintiff, that does not constitute a "direct loss of property" belonging to plaintiff.

Plaintiff attempts to avoid the effect of Penn Square's ownership of the money deposited by arguing that if the money had instead been gold, and the gold disappeared from Penn Square, the gold would have been covered by the bond. That might be true if the gold had been deposited in a "special deposit" with Penn Square. In that situation, the relationship between plaintiff and Penn Square would not be as debtor and creditor, but as bailor and bailee—plaintiff would retain ownership of the gold, and Penn Square would be merely a trustee or guardian of the gold. If, however, the gold, like plaintiff's $3 million, were given instead in exchange for a certificate of deposit, with no requirement that Penn Square return the gold intact, or keep the gold separate from its general assets, the gold would become the property of Penn Square, and its loss from Penn Square's premises would be a direct loss to Penn Square, not to plaintiff. The distinction between general and special deposits is well established,[41] and plaintiff, a credit union, surely is not unfamiliar with the distinction.[42]

In sum, plaintiff has raised no factual issues regarding the ownership of the money lost through "burglary, larceny, misplacement or mysterious unexplained disappearance" and as a matter of law, that money was then money owned by Penn Square. Further, the plaintiff's investment in Penn Square's certificates of deposit was in the nature of a loan and the loss of its investment therefore was excluded from the policy's coverage by the loan exclusion clause. Accordingly, summary judgment of plaintiff's third claim is warranted.

The defendant's motion for summary judgment of each of plaintiff's three claims is granted.

So ordered.

---

**40.** *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 560 (2d Cir.1976); 5A Michie, *Banks and Banking* § 4b (1983) and cases cited therein; 5B Michie, *Banks and Banking* § 318 (1983) and cases cited therein.

**41.** *Miller,* 540 F.2d at 561; 5B Michie, *Banks and Banking* § 328 (1983) and cases cited therein.

**42.** Plaintiff does not contend that Penn Square committed a theft or larceny in procuring the plaintiff's deposit, in which case plaintiff might argue that money in which it had a pecuniary interest was lost through theft or larceny. *See Liberty Nat'l Bank & Trust Co. v. Travelers Indem. Co.,* 58 Misc.2d 443, 295 N.Y.S.2d 983 (Sup.Ct.1968). Instead, plaintiff claims that the loss occurred "as a result of burglary, larceny, misplacement or mysterious unexplained disappearance while [the property was] on deposit at Penn Square N.A."—after title to the money had passed to Penn Square.