**BROADWAY NATIONAL BANK, Plaintiff,**

v.

**PROGRESSIVE CASUALTY INSURANCE COMPANY, Defendant.**

**No. 90 Civ. 6953 (MBM).**

United States District Court, S.D. New York.

Oct. 7, 1991.

Peter J. Mastaglio, Cullen and Dykman, Garden City, N.Y., for plaintiff.

Bradford R. Carver, Hermann, Cahn & Schneider, Cleveland, Ohio, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, Broadway National Bank ("Broadway") sues its insurer, the Progressive Casualty Insurance Company ("Progressive"), under a Financial Institution Bond (the "Bond"), for losses sustained when credit card sales drafts deposited by a merchant customer proved uncollectible. Progressive contends that recovery is barred by two exclusionary clauses in the Bond. The parties have cross-moved for summary judgment. For the reasons set forth below, plaintiff's motion is denied, and defendant's motion is granted.

### I

In January 1989, Broadway entered into an Associate Agreement ("Agreement") with Chemical Bank, enabling Broadway to process credit card transactions for its merchant customers. Chemical is a member of MasterCard International Incorporated, the network of financial institutions that processes MasterCard and VISA credit card transactions. Under the Agreement, Chemical named Broadway an associate of MasterCard, thereby giving Broadway access to the network through Chemical. (Plaintiff's Rule 3(g) Statement ¶¶ 7–9)

As a member bank, Chemical plays a variety of roles. It issues credit cards, serves as a clearinghouse for credit card transactions, and recruits associate banks to serve as collection agents for credit card sales slips generated by local businesses. (Plaintiff's Rule 3(g) Statement ¶¶ 7–9) An associate bank, such as Broadway, enters into agreements with local merchants—merchants agreements—pursuant to which a merchant agrees to accept certain credit cards in satisfaction of a sale, and the associate agrees to redeem the sales slips either by crediting an account or paying the merchant by check in the amount of the sales slip less a standard discount. (Barton

Russell Merchant Agreement ¶¶ 1, 4; Plaintiff's Rule 3(g) Statement ¶ 13)

As set forth in a document entitled the Merchant Bank Program ("Program"), Broadway, as an associate of Chemical, was bound to follow specific procedures in dealing with its merchant customers. The Program specified that on a daily basis, merchants were to place sales slips in a sealed envelope, prepare a summary report, and attach an adding machine tape tallying the enclosed slips. The package would then be mailed or delivered to Broadway, which would reimburse the merchant. Under the terms of the Program, Broadway was entitled to check the merchant's calculations, but could not open the sealed envelope and verify that it contained the slips detailed on the summary report and adding machine tape. (Program pp. 9–12)

After receiving a package of slips from a merchant, it was Broadway's policy to make the amount credited to the merchant's account available for withdrawal after one business day. (Complaint in New York State Action *Broadway National Bank v. Barton Russell Corp.* ¶ 12) However, it was only after a lengthy procedure that Broadway would learn that some slips were invalid and could not be redeemed: Broadway would send the sealed envelope along with the attached tape and summary report to Chemical for processing. Upon receipt of the slips, Chemical would credit Broadway's maintenance account, and then forward the slips to the network. The network would charge the issuer of the card in the amount of the slip, and the issuer in turn would bill the cardholder, usually by a monthly statement. If the charge was contested, the issuer, on behalf of itself or its cardholder, would remit the charge through the network to Chemical. Without notifying Broadway, Chemical could then send the slip back through the network for reprocessing. If after two attempts at processing, an invalid charge slip was returned unpaid from the network to Chemical, Chemical would then charge back Broadway's service account. That process could take up to six months, and only when it was charged back would Broadway learn that a slip was invalid. Having credited the merchant's account upon receipt of the slips, Broadway would then be left to collect from the merchant in order to avoid a loss on the contested charge. (Cardone Aff. ¶¶ 12–18)

The delay in processing credit card sales slips presents unscrupulous merchants with an opportunity to abuse the system. That opportunity was seized by the officers of the Barton Russell Corporation ("Barton Russell"), an erstwhile merchant customer of Broadway. Barton Russell began its banking relationship with Broadway in November 1987, and began its credit card merchant relationship in January 1988. Ostensibly an art gallery, Barton Russell was in actuality a front for a male escort service. Its business, however, was not limited to the provision of escorts. Through the manipulation of card numbers and authorization codes, Barton Russell employees created numerous fraudulent sales slips which they deposited in the merchant account the corporation maintained at Broadway. Taking advantage of the long lag between the credit to the corporation's account at Broadway and Chemical's notification of Broadway that the slips were fraudulent, they then withdrew the funds before Broadway could act to protect its interests. (Cardone Aff. ¶¶ 19, 20) In its complaint, Broadway alleges that the withdrawals against the fraudulent receipts amounted to $196,065.25, and its loss, after the seizure of Barton Russell funds still on deposit, was $179,479.90.

This dispute arose when Broadway attempted to recover its losses under the Financial Institution Bond it had received from Progressive on July 15, 1988. Broadway notified Progressive of its claim, and a proof of loss was submitted on October 20, 1989. Progressive declined coverage, and this suit was filed on September 28, 1990. (Defendant's Rule 3(g) Statement ¶¶ 33–35) Plaintiff moved for summary judgment, arguing that under the Bond's clear and unambiguous terms it was entitled to recovery. Defendant cross-moved, asserting that under the circumstances of this case, the terms of the Bond exclude coverage of Broadway's claim.

## II

Defendant relies on two exclusionary clauses in the Bond to defeat Broadway's claim. The first excludes from coverage losses that result from the use of various types of credit and charge cards. Referred to as the "Credit Card Exclusion," this provision states:

> This bond does not cover: loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification, or other cards (1) in obtaining credit or funds ... whether such cards were issued, or purport to have been issued, by the Insured or by any one other than the Insured.

(Bond § 2(k)) The second clause excludes losses that result from unpaid depository instruments. This clause, which is referred to by the parties as the "Uncollected Funds Exclusion," states:

> This bond does not cover: loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud.

(Bond § 2(*o*)) Progressive argues that both of the above clauses allow it to decline coverage. Broadway asserts that the clauses do not apply to its claim.

Under Federal Rule of Civil Procedure 56(c), a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (*quoting* Fed.R.Civ. p. 1).

That the parties have cross-moved for summary judgment does not necessarily mean that there is no material issue of fact to be tried. *Home Ins. Co. v. Aetna Casualty & Surety Co.*, 528 F.2d 1388, 1390 (2d Cir.1976) (*per curiam* ). "[C]ross motions for summary judgment do not warrant the granting of summary judgment unless the Court finds that 'one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.'" *Bollenbach v. Board of Education*, 659 F.Supp. 1450, 1456 (S.D.N.Y.1987) (*quoting Frouge Corp. v. Chase Manhattan Bank*, 426 F.Supp. 794, 796 (S.D.N.Y.1976)).

In contract actions, summary judgment is appropriate only where the language of the relevant agreement is unambiguous. If a contract is clear on its face, its proper construction is a matter of law. *United States Naval Institute v. Charter Communications Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989). Furthermore, extrinsic evidence is inadmissible to contradict an unambiguous contract.

Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain the contract language beyond its reasonable and ordinary meaning.'

The parties' rights under an ambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. "The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.'"

*Metropolitan Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (*quoting Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978);

*Bethlehem Steel Co. v. Turner Construction Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 592–93 (1957); and *Diversified Mortgage Investors v. U.S. Life Title and Trust Ins. Co. of New York,* 544 F.2d 571, 575 (2d Cir.1976)) (citations omitted).

 In their construction and interpretation, insurance contracts are treated like other business contracts. *Hartol Products Corp. v. Prudential Ins. Co.,* 290 N.Y. 44, 47, 47 N.E.2d 687 (1943); *Sullivan County Gas Service Inc. v. Phoenix Mut. Life Ins. Co.,* 111 A.D.2d 542, 489 N.Y.S.2d 415 (3d Dept.1985). Thus, where the terms of an insurance policy are unambiguous, they must be given their plain and ordinary meaning, and a court must refrain from rewriting the agreement. *U.S. Fidelity & Guaranty Co. v. Annunziata,* 67 N.Y.2d 229, 501 N.Y.S.2d 790, 791, 492 N.E.2d 1206, 1207 (1986); *HS Equities, Inc. v. Hartford Accident & Indemnity Co.,* 609 F.2d 669, 673 (2nd Cir.1979). Under such circumstances, the question is one of law, and summary judgment is proper. In the words of Judge Weinfeld:

> Contracts of insurance, like other contracts are to be construed to effectuate the parties' intent as expressed by the words the parties used, and if the terms of the contract are clear and unambiguous, the Court must enforce the plain, ordinary and common meaning of those terms.

*IBM Poughkeepsie Employees Federal Credit Union v. Cumis Insurance Society,* 590 F.Supp. 769, 772 (S.D.N.Y.1984) (granting summary judgment based on clear terms of insurance contract). Thus, the issue presented by these motions for summary judgment is whether the language contained in either or both of the clauses is "reasonably susceptible" to only one interpretation. *See Cable Science Corp. v. Rochdale Village Inc.,* 920 F.2d 147, 151 (2d Cir.1990). Each clause will be considered in turn.

### A. *The Credit Card Exclusion*

The Credit Card Exclusion is broad. On its face, the language "loss resulting directly or indirectly from the use or purported use of credit ... cards" appears to exclude recovery for any loss suffered by Broadway as a result of the use or misuse of credit cards. Both parties cite a standard form for financial institution bonds which states:

> Unless employee dishonesty is involved, all losses resulting from the use of credit ... cards is excluded ... The language is clear and has resulted in no reported decisions.

*Annotated Banker's Blanket Bond,* First Supplement (American Bar Association 1983).

However, in the context of this case, the Credit Card Exclusion may be construed as susceptible to more than one interpretation. It is arguable that the clause may be unclear regarding schemes, such as that perpetrated by Barton Russell, whereby, rather than the actual credit cards, authorization codes and card numbers serve as the basis for fraud. The clause lends slight support to this view in that it speaks only of "credit cards" and not of account numbers or authorization codes. Ambiguity conceivably could arise from the reference only to "cards" and not to "card numbers" or a similar term, raising the question of whether use of card numbers is "directly or indirectly ... purported use of ... cards." To be sure however, it is at least arguable that the clause's exclusion of losses resulting "indirectly" from the "purported use" of credit cards, is enough to cover situations where card numbers and codes are used to commit fraud. Moreover, the standard form cited by both parties to explain the terms of the Bond, confirms that the language of the clause "address[es] the situation in which funds are obtained through the fraudulent use of the card number." *Annotated Financial Institution Bond,* Second Supplement (American Bar Association 1983).

 Nevertheless, I hesitate to base a decision for the defendant on the Credit Card Exclusion for two reasons. First, in a motion for summary judgment on a contract, extrinsic evidence which may clarify the meaning of a clause, such as the standard form, is inadmissible for the purposes

of interpreting and applying a clause. *Metropolitan Life*, 906 F.2d at 889. Second, "[i]n New York, when an insurer seeks to disclaim liability through an exclusion clause in the policy the insurer must prove that the insured clearly is not covered by the policy. [citation of cases omitted]. Any ambiguities are to be resolved in favor of the insured." *Marino v. New York Telephone Co.*, 944 F.2d 109, 112 (2d Cir. 1991). Given these rules, if there is even a possible ambiguity as to the applicability of the Credit Card Exclusion, summary judgment is problematic.

However, I need not and do not decide that issue. The alternative exclusionary clause relied upon by defendant, the Uncollected Funds Exclusion, is entirely unambiguous and excludes Broadway's claim. Thus, although the argument that the Card Exclusion is ambiguous seems far fetched, resolution of that issue is unnecessary.

### B. *The Uncollected Funds Exclusion*

■ The Uncollected Funds Exclusion covers losses resulting from "items of deposit" to a customer's account which are ultimately unpaid. The sole dispute regarding this clause is whether "items of deposit" includes credit card sales slips. The clause admits of no other interpretation than that advocated by Progressive; Broadway's argument that "items of deposit" does not cover credit card slips is meritless.

In general, courts which have applied the Uncollected Funds Exclusion have found the clause as a whole "unambiguous," and have given the language its ordinary meaning. *See Mitsui Mfrs. Bank v. Federal Insurance Co.*, 795 F.2d 827, 830 (9th Cir. 1986); *Bradley Bank v. Hartford Accident & Indemnity Co.*, 737 F.2d 657, 660 (7th Cir.1984). Although no court has yet construed "items of deposit," like the other terms used in the clause, its meaning is plain. The ordinary and obvious meaning of the words "items of deposit" is any financial instruments accepted by a bank for deposit.

That the term "items of deposit" is unambiguous is evident not only from the clarity of the language, but also from the accepted practice of the banking industry. The general practice for banks is to accept credit card sales slips for deposit by a merchant. As part of the agreement with an associate bank, most merchants maintain a regular depository account with the associate bank, to which all charges and credits arising from credit card transactions are entered. *See* Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 11.02[4][b] (1990). Moreover, Article 4 of the Uniform Commercial Code, which governs Bank Deposits and Collections, suggests that "items," as used in the banking industry generally, is a broad enough term to encompass credit card sales slips. The U.C.C. defines "items" to include "*any* instrument for the payment of money even though it is not negotiable but does not include money." N.Y. Uniform Commercial Code § 4–104(g) (McKinney 1991) (emphasis added). On its face, such a definition would include credit card slips. A recent decision from another jurisdiction, construing an identical provision, held that credit card slips are "items" within the cited U.C.C. provision. *See First United Bank v. Philmont Corp.*, 533 So.2d 449 (Miss.1988).

Furthermore, in processing credit card transactions, Broadway treated credit card slips as "items of deposit." For instance, it is uncontested that Barton Russell maintained an account with Broadway which was credited when sales slips were redeemed. (Defendant's Rule 3(g) Statement ¶ 20; Complaint in New York State Action *Broadway National Bank v. Barton Russell Corp.* ¶ 13). This was a regular practice with merchant customers. The preprinted form used for merchant agreements included a provision which stated that, if the merchant chose, Broadway would reimburse for sales slips by "credit to the Merchant's checking account with the Bank." (Merchant Agreement § 4) Moreover, Broadway regularly exchanged the credit card slips it had redeemed for credit to an account maintained at Chemical. (Cardone Aff. ¶ 8) Thus, at Broadway, credit card slips were used regularly as the basis for crediting a merchant's ac-

count and for deposit to the Bank's own account; in other words, they were accepted and used by Broadway as instruments for deposit.

Broadway's attempts to obfuscate the term only serve to emphasize its clarity. Broadway argues first that "items of deposit" includes checks only, and therefore the policy would not cover losses from the fraudulent use of credit card drafts. However, the exclusion applies to "items of deposit" and is not limited to checks. Instead, use of the plural "items," in lieu of naming any specific kind of instrument, necessarily means that more than one type of depository instrument is covered. Limiting application of the exclusion to a single instrument, as advocated by Broadway, runs counter to the plain language contained in the clause and results instead in a strained construction.

In addition to checks *which are deposited,* the plain meaning of "items of deposit" also includes credit card slips *which are deposited.* Ironically, this point is clearly demonstrated by the flaws in one of Broadway's arguments. Broadway asserts that because the Merchant Agreement does not require the merchant to maintain an account with the Bank and allows the slips to be exchanged for a check, the slips cannot be considered "items of deposit." In making this argument, Broadway's Memorandum of Law asks rhetorically: "If no account was required, into what was the sales slip or item of deposit to be deposited?" (Plaintiff's Memorandum of Law p. 10). Presumably, the argument is that because the Merchant Agreement did not require that credit card drafts be deposited, those instruments could not possibly be "items of deposit" even when they are deposited. The necessary implication is that "items of deposit" includes only those instruments which must be deposited. However, that the Barton Russell Merchant Agreement did not require the deposit of credit card slips is irrelevant. This is evident when one considers plaintiff's prototypical item of deposit—the check. Checks, like the credit card slips here in question, may be deposited in a bank, but they may also be exchanged for cash,

goods or another check. Nevertheless, plaintiff asserts that checks are unquestionably "items of deposit" while credit card slips could not possibly be "items of deposit" because their deposit was not required. However, even as to a check, which plaintiff insists must be an "item of deposit," it is not the nature of the instrument itself but rather how it is used, *i.e.* whether it is in fact deposited, that determines whether it is an "item of deposit". Following the reasoning inherent in plaintiff's own check example, credit card slips are "items of deposit" when they are deposited by the merchant and received for deposit by the bank. *Cf. Bay Area Bank v. Fidelity & Deposit Co.,* 629 F.Supp. 693 (N.D.Cal.1986) (where both the court and the parties assumed "items of deposit" included credit card slips).

By its plain and unambiguous terms the Uncollected Funds Exclusion applies to this case, and bars recovery by plaintiff. Plaintiff's motion for summary judgment is denied; defendant's motion is granted, and the complaint is dismissed.

SO ORDERED.