**BURGER KING CORPORATION,**
Plaintiff,

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant.**

No. 04–20540–CIVSEITZ.

United States District Court,
S.D. Florida.

June 30, 2005.

Amanda Jason, Michael D. Joblove, Genovese Joblove & Battista, Miami, FL, for Plaintiff.

Kathleen Johnson Maus, Butler Pappas Weihmuller Katz Craig, Tallahassee, FL, Scott Jeffrey Frank, Butler Pappas Weihmuller et al., Miami, FL, Erin L. Majka, Kathleen A. Sweitzer, Todd S. Schenk, Tressler Soderstrom Maloney Priess, Chicago, IL, for Defendant.

*ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION TO STRIKE SPECIFIC PARAGRAPHS OF THE AFFIDAVIT OF TODD S. SCHENK*

SEITZ, District Judge.

THIS MATTER is before the Court upon the cross Motions for Summary Judgment filed by Defendant Lumbermens Mutual Casualty Company's ("LMC") [DE–96] and Plaintiff Burger King Corporation ("BKC") [DE–116], and BKC's Motion to Strike Specific Paragraphs of the Affidavit of Todd S. Schenk Filed by Defendant LMC in Support of Their Motion for Summary Judgment [DE–115]. BKC commenced this action in March 2004 by filing a Complaint asserting counts for breach of contract (Count I) and declaratory relief (Count II). Specifically, BKC argues that LMC is contractually required to indemnify BKC for amounts that it paid to settle a lawsuit filed by a BKC franchisee in Michigan. LMC moves for summary judgment on the grounds that, *inter alia:* (1) the LMC insurance policy under which BKC's claims arise does not cover the discrimination claims in the Michigan action; (2) BKC is improperly seeking coverage for amounts that exceeded the actual settlement amount set forth in the parties' Confidential Settlement Agreement; (3) the doctrines of collateral and judicial estoppel prevent BKC from relitigating the amount paid to settle the Michigan action; and (4) BKC has forfeited any right to coverage because it failed to obtain LMC's written consent to the settlement, as required by the policy.

BKC, in turn, contends that LMC's motion must be denied, and summary judgment must be entered in BKC's favor, because (1) LMC is estopped from denying coverage based on its analysts' pre-litigation assurances that coverage existed; (2) the discrimination claims set forth in the Michigan action are covered under LMC's personal injury policy; (3) LMC did not raise the issue of BKC's failure to obtain prior written approval in its answer, and has thus waived that affirmative defense; and (4) contrary to LMC's contentions, BKC is entitled to coverage up to the $5 million policy limit. BKC also asks the Court to strike portions of the affidavit of Todd S. Schenk, one of LMC's attorneys, that LMC submitted in support of its motion for summary judgment, contending that certain paragraphs are not substantiated by the affiant's personal knowledge. Upon careful review of the parties' cross Motions, the responses and replies thereto, and the relevant portions of the record, the Court finds that LMC is entitled to summary judgment as to all issues set forth in BKC's Complaint, and BKC's motions must be denied.

## I. FACTUAL BACKGROUND

### A. The LMC Insurance Policy

LMC, d/b/a Kemper Insurance Company, issued to "Grand Metropolitan, Inc. c/o The Pillsbury Company" a policy of commercial general liability insurance, policy number 5AA 038 025–00, effective July 1, 1999, through July 1, 2000 ("LMC Policy"). *See* Aff. of Todd. S. Schenk at ¶ 6, Ex. 4. The LMC Policy was made in New York, New York, through the participation of Grand Metropolitan, Inc.'s insurance broker, J & H Marsh & McLennan, Inc. *Id.* at Ex. 4. Effective July 1, 1999, the Named Insured on the LMC policy was amended to "Diageo, Inc." *Id.* The Named Insured on the LMC Policy was also further amended, effective July 1, 2999, to include BKC. *Id.*

The LMC Policy only provides coverage for "those sums that the insured becomes

legally obligated to pay as damages because of 'personal injury' . . . to which this insurance applies." *Id.* at Ex. 4, LMC 109. The "personal injury" coverage in the LMC Policy includes "[d]iscrimination or humiliation as long as it results in injury to the feeling or reputation of a natural person, but only if such discrimination or humiliation is not done intentionally by or at the direction of: (a) The insured; or (b) Any executive officer, director, stockholder, partner or member of the insured." *Id.* at Amendatory Endorsement # 13. Further, the LMC Policy provides that this definition of "personal injury" does not apply in any state where insurance for such injury is contrary to law. *Id.*

The LMC Policy provides for a maximum of $5,000,000 in coverage for personal injuries, subject to a deductible of $1,000,000. *Id.* at Amendatory Endorsement # 33. The LMC Policy further provides that the insured "will not voluntarily pay any amounts in excess of the deductible amount without prior written approval from [LMC]." *Id.*

### B. The Hawkins Lawsuit

BKC is a Florida corporation with its principal place of business located in Miami–Dade County, Florida. *See* Decl. of W. Barry Blum at ¶ 2. BKC operates and franchises Burger King® restaurants throughout the United States. *Id.* On April 14, 2000, LaVan Hawkins, a Burger King franchise owner, and his companies sued BKC in the United States District Court for the Eastern District of Michigan, Southern Division, in Case No.2000–CV–60230 ("the Hawkins Lawsuit"). Schenk Aff. at ¶ 5, Ex. 3. The Hawkins Lawsuit included causes of action for: (1) violation of the Michigan Franchise Investment Law; (2) fraudulent misrepresentation; (3) silent fraud; (4) innocent misrepresentation; (5) promissory estoppel; (6) racial discrimination in violation of 42 U.S.C. § 1981; (7) breach of contract; (8)

breach of implied duty of good faith and fair dealing; and (9) injunctive relief. *Id.* The Honorable Marianne O. Battani presided over the Hawkins Lawsuit. *Id.*, Ex. 3 at 1.

With respect to the allegations of racial discrimination under § 1981, the Hawkins Lawsuit alleged that "BKC intentionally sabotaged and breached the contract entered into with Hawkins. Hawkins further learned that the destructive actions of BKC against his interests were, in part, racially motivated." *Id.* at ¶ 42. The Complaint in the Hawkins Lawsuit further alleged that "Hawkins was being denied opportunities that were afforded other BKC franchisees and was otherwise negatively singled-out by BKC, in part, because of his race." *Id.* at ¶ 43. In order to bolster his lawsuit, Hawkins and his companies also engaged in a publicity campaign against BKC, during which the Reverend Al Sharpton held televised press conferences charging BKC with discrimination and a national boycott by African Americans was threatened. Blum Decl. at ¶ 9, Exs. 2–3.

BKC filed a motion to dismiss the complaint in the Hawkins Lawsuit based, in part, on certain releases that Hawkins had executed prior to filing suit. *Id.* at ¶ 11. On December 14, 2000, Judge Battani granted BKC's motion and dismissed the Hawkins lawsuit in its entirety. *Id.* at ¶ 11, Ex. 5. Hawkins filed a Notice of Appeal with the Sixth Circuit Court of Appeals on December 27, 2000. *Id.* at ¶ 11, Ex. 6.

### C. The Settlement of the Hawkins Lawsuit

On December 30, 2000, after the Hawkins Lawsuit had been dismissed and Hawkins had filed his Notice of Appeal, Hawkins and BKC entered into a Confidential Settlement Agreement ("the

CSA"). Schenk Aff. at ¶ 11, Ex. 9. BKC states that it settled the case solely because it was concerned about the possible exposure and negative publicity arising out of Hawkins' discrimination claim. Blum Decl. at ¶ 14–15. The CSA provided that BKC would pay a total of $21,000,000 to purchase Hawkins' Burger King restaurants, as well as $2,000,000 "in full compromise and settlement" of the Hawkins Lawsuit. Schenk Aff., Ex. 9 at 3–4, 10–11. The CSA further provided that the CSA, along with the other documents being executed and delivered pursuant thereto, constituted the full and entire agreement and understanding between the parties. *Id.* More specifically, the CSA provided that "[the CSA], together with the Purchase Agreement, the Additional Agreement, the Escrow Agreement and the Holdback Agreement, incorporates all prior discussions and negotiations among the parties hereto and constitutes the entire agreement among the parties hereto ...." *Id.* The CSA clearly indicated that there were no other agreements of any kind whether oral or in writing between BKC, Hawkins and his companies, with respect to the settlement of the Hawkins' Lawsuit. *Id.* The CSA does not allocate the $2 million settlement amount among the various causes of action asserted in the Hawkins Lawsuit. *Id.*

According to BKC, the agreement that it initially reached with Hawkins (before the CSA was executed) was for a settle-

ment amount of $30 million, which included the purchase of Hawkins' Burger King restaurants for $16.75 million, and $13.25 million for the release of Hawkins' discrimination claims against BKC. Blum Decl. at ¶ 17. BKC asserts that the $13.25 million was to be distributed as follows: $2 million paid in cash; $7 million in debt forgiveness; and a premium of $4.25 million built into the purchase price of the Hawkins restaurants. *Id.* BKC further states that the $13.25 million towards settlement was a reasonable settlement, as it reflected only a small percentage of the more than $1.9 billion sought in the Hawkins Lawsuit. *Id.* at ¶ 18.

After that initial agreement was reached, and only two days before the CSA was signed, Hawkins' attorneys called BKC and asked that the settlement funds be reallocated. *Id.* at ¶ 19. BKC agreed, and BKC entered into the CSA which called for BKC to pay Hawkins $2 million in cash and $21 million to purchase Hawkins' restaurants. *Id.* BKC contends that this "was merely a matter of convenience made after the settlement was agreed to." *Id.* This re-allocation of the settlement proceeds was also addressed in letters sent from BKC's insurance carrier to LMC's counsel.[1]

According to BKC, it provided LMC with notice of the Hawkins Lawsuit, as required under the LMC Policy, well before any settlement was reached. *See*

---

1. After BKC settled the Hawkins Lawsuit, Michael C. Sorresse of Marsh, Inc., the insurance broker for BKC, sent a June 6, 2001, letter to LMC demanding indemnification. Schenk Aff. at ¶ 28, Ex. 24. In that letter, Mr. Sorresse admitted that the signed agreement that the parties entered into allocated only $2 million to the litigation settlement. *Id.* Mr. Sorresse stated, however, that "[i]n reality, another $7M of debt forgiveness is attributable to the litigation as well as $4.25M included as a 'premium' on the restaurant price." *Id.* at 1. According to Mr. Sorresse, the reallo-

cation, as reflected in the CSA, was due to a request by Hawkins "made to improve Hawkins" positions with his attorneys and creditors to whom he had pledged a portion of his litigation settlement. *Id.* Similarly, Joan C. Considine of March USA, Inc., stated, in a February 15, 2002, letter to LMC's counsel, that the settlement amount in the CSA was redistributed "in order to effectuate the settlement of this matter, as well as given Hawkins a favorable advantage in dealing with Norman Yatooma ...." *Id.* at ¶ 29, Ex. 25 at 1.

Decl. of Kathleen Davies at ¶ 8. BKC further contends that LMC's claims analysts dedicated to BKC's account reviewed the policy and confirmed to BKC that coverage existed for the full $5 million for personal injury and advertising injury. *Id.* at ¶¶ 8–9. Specifically, BKC states that William Mensie, a member of LMC's specialty claims unit, noted in the claims file that the allegations in the Hawkins Lawsuit would be sufficient to trigger a duty to defend on LMC's part. Mensie Dep. at 22. When settlement talks began to pick up in November 2000, BKC's Vice President of Safety and Risk Management, Kathleen Davies, asked Mensie what to do if BKC was able to reach a settlement with Hawkins. *See* Davies Decl. at ¶ 11. According to Davies, Mensie stated that BKC should not worry about seeking LMC's approval for a settlement, and that if BKC felt it was in its best interests to settle the case, it should do so. Davies states that Mensie then told her that after the settlement, LMC would discuss the amount of reimbursement under the LMC Policy with BKC. *Id.*

### D. The Charging Lien and Judge Battani's Orders

After the CSA was entered into, Hawkins' attorney, Norman Yatooma, filed a charging lien with respect to the settlement. *Id.* at ¶ 21. Yatooma served Hawkins and BKC with notices of his attorney's lien on December 29, 2000, and January 16, 2001, respectively. Schenk Aff., Ex. 19 at ¶ 3. Then, on January 18, 2001, Yatooma advised all of the parties to the Hawkins Lawsuit that pursuant to his agreement with Hawkins, he was seeking fifteen percent of the entire $23 million amount described in the CSA, in addition to his costs and hourly fees charged at a blended hourly rate. *Id.* at ¶ 13, Ex. 11. On January 25, 2001, BKC filed its Motion to Resolve Charging Lien and Request for an Emergency Hearing and/or Status Conference. *Id.* at ¶ 12, Ex. 10.

On March 8, 2001, Judge Battani held a hearing on BKC's Motion. *Id.* at ¶ 16, Ex. 14. During the hearing, Hawkins' new counsel, Sheryl Toby, requested that Judge Battani discharge Norman Yatooma's lien on the $21 million purchase price for the restaurants. *Id.*, Ex. 14 at 39. Judge Battani ultimately ruled that Yatooma was entitled to an attorney's lien on only the $2 million settlement amount, and discharged the lien as to the $21 million restaurant purchase price. *Id.* at 40. Counsel for BKC, who was in attendance at the March 8, 2001, hearing, never objected to the relief requested by Hawkins or to Judge Battani's ruling. *Id.* On April 9, 2001, Judge Battani entered an Order Partially Discharging Lien in accordance with the oral rulings at the March 8, 2001, hearing. *Id.* at ¶ 18, Ex. 16.

On April 30 and May 1, 2001, Judge Battani held an evidentiary hearing to address Yatooma's remaining attorney's lien on the $2 million settlement amount. *Id.* at ¶ 20. Following the evidentiary hearing, Judge Battani made a final ruling awarding Yatooma $146,145 in attorney's fees and costs. *Id.* at ¶ 23, Ex. 19. This ruling was affirmed by the Sixth Circuit. *See La–Van Hawkins Urban City Foods, et al. v. Burger King Corp.,* Nos. 01–2678 and 01–2737, 2003 WL 22284041 (6th Cir. 2003).

### II. BKC'S MOTION TO STRIKE SPECIFIC PARAGRAPHS OF THE SCHENK AFFIDAVIT

Before reviewing the merits of the parties' motions for summary judgment, the Court must address an issue regarding the sufficiency of the affidavit of Todd S. Schenk, one of LMC's attorneys, submitted in support of LMC's motion for summary judgment. BKC contends that the

Schenk Affidavit includes certain statements about which Schenk does not have personal knowledge, and refers to documents that have not been properly authenticated. In general, BKC's objections relate to Mr. Schenk's statements (in paragraphs 14–15, 17, 22, 28, 30–31 of the Affidavit) that certain facsimile transmissions, letters, a transcript from a deposition in the Hawkins Lawsuit, opinions issued by the New York Department of Insurance, and other documents are "true, accurate and authentic" copies. BKC states that Mr. Schenk does not have personal knowledge as to how the documents in question were generated, and lacks the ability to testify as to their authenticity.

■ Fed.R.Civ.P. 56(e) provides that affidavits supporting and opposing motions for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." An affidavit has no probative value and must be stricken when it contains conclusions rather than statements of fact, or when it is not based on personal knowledge. *See Benton–Volvo-Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135, 139 (5th Cir.1973); *see also Johnson v. Scotty's, Inc.,* 119 F.Supp.2d 1276, 1281 (M.D.Fla.2000) ("[a]n affidavit must be stricken if it is a conclusory argument rather than a statement of fact, or when the affidavit is not based on personal knowledge.").

Here, in its response in opposition to BKC's motion, LMC has raised persuasive arguments supporting the authenticity of each of the challenged documents about which Mr. Schenk testified in his Affidavit. For instance, LMC contends that: (1) the facsimile transmissions referenced in paragraphs 14–15 and 17 of the Schenk Affidavit were either obtained directly from the litigation file of Dennis Levasseur, BKC's

attorney in the Hawkins Lawsuit, or were produced by BKC in its documents production to LMC in this case; (2) the deposition transcript referenced in paragraph 22 is self-authenticating under Fed.R.Evid. 902(8) and/or is a public record under Fed. R.Evid. 901(a); (3) the letter referenced in paragraph 28 was authenticated in another affidavit filed in connection with this case; and (4) the letter and opinion issued by the New York Insurance Department, referenced in paragraphs 30 and 31, are self-authenticating in accordance with Fed. R.Evid. 902(5). The Court agrees with each of LMC's arguments in this regard, and finds that the challenged portions of the Schenk Affidavit are sufficient to satisfy Fed.R.Civ.P. 56(e) and the rules of evidence. Additionally, even if some of these documents were not properly authenticated at this time, the Court could still consider them at the summary judgment stage if "it finds that those records could be reduced to admissible evidence at trial." *See Simmons v. Conseco Life Ins. Co.,* 170 F.Supp.2d 1215, 1219 (M.D.Fla.2001) (citing *Mims v. Old Line Life Ins. Co. of America,* 46 F.Supp.2d 1251 (M.D.Fla. 1999)). Given the nature of the challenged documents, the Court finds that they could easily be authenticated and rendered admissible at trial. Accordingly, BKC's Motion to Strike must be denied.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(c)). The

moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that initial burden is met, the non-moving party must go beyond the pleadings and "come forward with 'specific facts showing that there is a genuine issue for trial.'"[2] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. In so doing, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Indeed, a mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see also Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir.1998) (citations omitted). The Court must then decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). With these principles in mind, the Court turns to the parties' respective motions for summary judgment.[3]

2. BKC argues in its response memorandum that LMC's motion for summary judgment is "premature" because certain documents had not yet been produced, and there was an outstanding motion to compel production of key documents within LMC's claim file. The Court rejects this argument. First, it cannot be said that LMC's motion, which was filed only four days before the court-imposed dispositive motion deadline, was "premature." The parties had nearly a year of discovery before the motion was filed. Second, a party requesting relief under Fed.R.Civ.P. 56(f) must specifically demonstrate how additional discovery will enable it to withstand summary judgment. *See Wallace v. Brownell Pontiac-GMC Co., Inc.,* 703 F.2d 525, 527 (11th Cir. 1983) (the party seeking relief under Rule 56(f) must offer an affidavit explaining to the Court why it is unable to make a substantive response absent further discovery); *SEC v. Spence & Green Chem. Co.,* 612 F.2d 896, 901 (5th Cir.1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981) (the "nonmovant may not simply rely on vague assertions that additional discovery will produced needed, but unspecified, facts, particularly where, as here, ample time and opportunities for discovery have already lapsed."). Here, BKC has simply stated that the requested documents contain information that "could potentially be damaging to LMC." Third, the then-pending motion to compel has since been resolved, and there has been no showing that such documentation supports BKC's claims.

3. It must be noted that BKC's cross-motion for summary judgment is untimely. On December 21, 2004, this Court extended the previously established pretrial schedule and trial date, and set a deadline of March 11, 2005, for the parties to file any dispositive motions in this case. LMC timely filed its motion on March 7, 2005. BKC did not file its cross motion until April 11, 2005, along with its response to LMC's motion. BKC has not demonstrated any "good cause" for its failure to comply with the Court's trial order, other than its belief that it was "appropriate" to file a cross motion along with the response, without the need to seek an extension from the Court. Accordingly, it is within the Court's discretion to deny BKC's cross-motion as untimely. Nonetheless, because the issues asserted in BKC's cross-motion are essentially intertwined with those in its response to LMC's motion, the Court will consider the merits of BKC's motion in this Order.

**B. The Discrimination Claims in the Hawkins Lawsuit Are Not Covered Under the LMC Policy**

LMC first argues that it is entitled to summary judgment because the LMC Policy does not cover discrimination done intentionally by, or at the direction of, BKC or any of its executive officers, directors, or stockholders. The only discrimination claim asserted in the Hawkins Lawsuit was under 42 U.S.C. § 1981. According to LMC, the Hawkins Lawsuit's § 1981 claim alleged intentional discrimination, and is thus not covered under the LMC Policy. BKC contends, however, that it is entitled to coverage because (1) Hawkins' attorney also raised disparate impact allegations during hearings before Judge Battani; and (2) the allegations of discrimination were incorporated into Hawkins' other claims, such as fraud and misrepresentation, which do not require intentional acts.

*1. New York Law Applies*

■ As an initial matter, the Court must determine which law to apply in interpreting the LMC Policy. A court sitting in diversity must apply the choice of law rules of the forum state. *American Family Life Assur. Co. v. United States Fire Co.*, 885 F.2d 826, 830 (11th Cir.1989). With respect to issues of contract interpretation, Florida uses the *lex loci contractus* approach, such that the law of the state where the contract is made controls. *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1236 (11th Cir.1995); *see also*

*Sturiano v. Brooks*, 523 So.2d 1126, 1129 (Fla.1988). Here, the evidence demonstrates that Grand Metropolitan (the named insured on the policy) had a New York address, Grand Metropolitan was represented by a New York insurance broker, and LMC issued the policy from New York. Accordingly, interpretation of the LMC Policy is governed by New York law,[4]

*2. The LMC Policy Clearly and Unambiguously Excludes Coverage for Hawkins' Intentional Discrimination Claims*

■ Next, the analysis turns to whether the discrimination claims in the Hawkins Lawsuit fall within the definitions set forth in the LMC Policy. In an insurance case, summary judgment is appropriate only where the language of the relevant insurance policy is clear and unambiguous. *See Broadway Nat. Bank v. Progressive Cas. Ins. Co.*, 775 F.Supp. 123, 126 (S.D.N.Y.2001). Where the language is unambiguous on its face, its proper construction is a matter of law, and the terms of the agreement must be given their "plain and ordinary meaning." *Id.* (citing *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 501 N.Y.S.2d 790, 492 N.E.2d 1206 (1986) & *HS Equities, Inc. v. Hartford Accident & Indem. Co.*, 609 F.2d 669, 673 (2d Cir.1979)).

■ Upon review of Hawkins' Complaint and the unambiguous terms of the

---

**4.** LMC argues that this case falls into an exception to the *lex loci contractus* rule, as set forth in *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119 (11th Cir.1990). In *Shapiro*, the Eleventh Circuit applied Florida law, rather than the law suggested by the *lex loci contractus* approach, because the insurance in question covered real property located in Florida. LMC contends that because BKC has extensive real estate holdings (and trademarks) in Florida, Florida law should apply. However, the trademarks and real estate in question, as it relates to the Hawkins Lawsuit, were located in Michigan. Florida has no relation to any of the property that was involved in the Hawkins Lawsuit. Therefore, the Court does not find the *Shapiro* exception to apply here. Ultimately, this issue has little bearing on this case, as the parties have not demonstrated any significant differences between the laws of New York and Florida as they apply to the interpretation of the LMC Policy's coverage provisions.

LMC Policy, the Court finds that BKC is not entitled to coverage for its settlement payments made in connection with the Hawkins Lawsuit. In fact, the specific allegations in the Complaint clearly evidence that they are premised on a theory of intentional (as opposed to unintentional or negligent) discrimination. Hawkins' Complaint asserts that "BKC intentionally sabotaged and breached the contract entered into with Hawkins," and that Hawkins "learned that the destructive actions of BKC against his interests were, in part, racially motivated." Schenk Aff. at ¶ 5, Ex. 3 at ¶ 42. The Complaint further alleges that "Hawkins was being denied opportunities that were afforded other BKC franchisees and was otherwise negatively singled-out by BKC, in part, because of his race." *Id.* at ¶ 43. These statements all invoke BKC's alleged intent to discriminate against Hawkins. In contrast, the Hawkins' Complaint does not set forth any facts (such as, for instance, allegations that BKC's facially neutral policies negatively impacted on racial minorities, in general) that would support a disparate impact claim. Because the clear and unambiguous language of the LMC Policy excludes intentional discrimination claims from coverage, BKC is not entitled to indemnification for the Hawkins settlement.

Further, even if Hawkins had pled facts supporting a disparate impact theory of discrimination, such a claim could not be maintained under § 1981. BKC admits that the only discrimination claim included in Hawkins' Complaint was under § 1981. Hawkins did not assert a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), or of any other statute that provides a cause of action for discrimination claims. Unlike Title VII, § 1981 only provides a cause of action for claims involving intentional discrimination. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that there can be no liability under § 1981 absent proof of intentional discrimination); *see also Guardians Ass'n v. Civil Service Comm'n of New York City,* 633 F.2d 232, 267 (2d Cir.1980). Therefore, Hawkins did not, and could not, pursue a disparate impact claim under § 1981.

### 3. BKC's Arguments in Opposition to LMC's Motion Fail

None of BKC's arguments set forth in its Response to LMC's motion for summary judgment and as part of its own cross-motion for summary judgment, are persuasive. First, BKC's primary argument—that it is entitled to coverage because Hawkins' attorney raised disparate impact allegations during hearings in the Hawkins Lawsuit—lacks both factual and legal support. BKC has not identified the hearings at which such purported allegations were raised, nor has it provided sufficient factual details as to the nature of the alleged disparate impact claims. Further, LMC points out, and BKC does not dispute, that Hawkins never amended his Complaint to include those alleged disparate impact claims. Mere statements by one of Hawkins' attorneys at an unidentified court hearing do not constitute a cognizable claim. More importantly, however, BKC's argument fails because, as a matter of law, Hawkins could not pursue recovery under a disparate impact theory under § 1981. *See Gen. Bldg. Contractors Ass'n,* 458 U.S. at 391, 102 S.Ct. 3141.

Second, BKC contends that the allegations of discrimination were incorporated into Hawkins' other claims, such as fraud and misrepresentation, which do not require intentional acts. BKC appears to argue that because BKC faced potential liability on these counts, which incorporated the discrimination allegations, LMC was required to indemnify BKC under the Policy. This argument, however, over-

looks the fact that other than the count for violation of § 1981, BKC has never alleged that any of the other nine counts at issue in the Hawkins Lawsuit was covered. Therefore, incorporation of intentional discrimination allegations into those counts is irrelevant.

■ Finally, BKC contends that LMC is estopped from denying coverage for BKC's indemnification claim because: (1) LMC's claims analysts orally advised BKC that coverage existed under the Policy; and (2) to refuse coverage, under the circumstances, would be to sanction fraud or other injustice. These arguments fail for several reasons. As an initial matter, BKC's argument is premised on a theory of promissory estoppel, which was never raised in BKC's Complaint or in its Answer to LMC's Counterclaim. The Deadline for amending the pleadings was on July 5, 2004, and no such amendment was ever made or even proposed. Thus, in accordance with federal court procedures, this argument has been waived. See Fed. R.Civ.P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... estoppel").[5]

■ BKC's estoppel argument also fails because, as a general rule, a court cannot create coverage by equitable estoppel. See Crown Life Ins., 517 So.2d at 661; see also Liberty Mut. Ins. Co. v. McDonald, 6 A.D.3d 614, 775 N.Y.S.2d 83, 85 (2d Dep't 2004). While courts have recognized that promissory estoppel is a "very narrow exception" to this general rule, this exception may only "be utilized to create insurance coverage where to refuse to do so would sanction fraud or other injustice." Id. at 662 (noting that "[a]n exception to the general rule is the doctrine of promissory estoppel, a qualified form of equitable estoppel which applies to representations relating to a future act of the promisor rather than to an existing fact."); see also AIU Ins. Co. v. Block Marina Invest., Inc., 544 So.2d 998, 1000 n. 1 (Fla.1989). Here, there has been no showing that the LMC's refusal to indemnify BKC for the discrimination claims in the Hawkins Lawsuit "would sanction fraud or other injustice." To the contrary, because the policy for which BKC bargained and paid a premium clearly and unambiguously excludes intentional discrimination claims from its coverage provisions, the Court's refusal to apply promissory estoppel to create coverage where none existed is a just and equitable result. Accordingly, BKC cannot prevail on its estoppel argument.[6]

## C. Collateral Estoppel/Judicial Estoppel

Although the Court's finding that the clear and unambiguous language of the LMC Policy precludes coverage is disposi-

5. The cases on which BKC relies were ones in which estoppel was specifically pled in the pleadings. See Crown Life Ins. Co. v. McBride, 517 So.2d 660, 661 (Fla.1987) ("[t]he trial court allowed respondent to amend his complaint to include claims for recovery based on estoppel and oral contract"); see also Peninsular Life Ins. Co. v. Wade, 425 So.2d 1181 (Fla. 2d DCA 1983). The Court also notes that these are Florida cases, but the analysis is not markedly different under New York law.

6. Also persuasive are LMC's arguments that: (1) BKC has not met its burden of demon-

strating promissory estoppel by clear and convincing evidence; (2) any reliance by BKC on LMC's alleged oral representations was unreasonable as a matter of law, in light of LMC's explicit reservation of rights letter; (3) Ms. Davies' affidavit does not support the claim of detrimental reliance; and (4) BKC appears to be distorting LMC's admission of a duty to defend into an admission of a duty to indemnify. Based on the applicable law and facts discussed in LMC's motion, the Court agrees that these issues further support the rejection of BKC's estoppel argument.

tive of this case, a few other issues warrant some discussion.[7] First, the parties' briefs focus extensively on the question of the actual value of the Hawkins settlement, and whether the terms of the CSA accurately represent the settlement between the parties to the Hawkins Lawsuit. In that regard, LMC argues that because the CSA provided for only a $2 million settlement, any possible coverage under the LMC Policy would be capped at $2 million. Second, LMC contends that BKC is estopped, under the doctrines of collateral and judicial estoppel, from relitigating the issue of the value of the Hawkins settlement because Judge Battani, in the proceedings relating to Norman Yatooma's attorney's lien, decisively ruled that the value of the Hawkins settlement was $2 million.

As to the first argument, the Court agrees that under the CSA, the maximum amount of coverage that BKC could have sought under the LMC Policy would be $2 million. Even if the LMC Policy provided coverage for the discrimination claims in the Hawkins Lawsuit, the LMC Policy only provides for coverage for those amounts that BKC becomes "legally obligated to pay as damages." As the undisputed record evidence demonstrates, the sole basis for BKC's legal obligation to pay damages to Hawkins is the CSA. While BKC apparently contends that the parties had agreed to a different distribution of the settlement proceeds than that which is reflected in the CSA, the language of the CSA, to which BKC agreed, clearly states that it constitutes the full and complete agreement between the parties, and that there are no other agreements of any kind (whether oral or in writing) between BKC,

Hawkins and his companies, with respect to the settlement of the Hawkins' Lawsuit. Therefore, any payments that BKC made to Hawkins in excess of the $2 million settlement amount expressly set forth in the CSA were voluntary payments for which no legal obligation to pay existed.

 With respect to LMC's collateral and/or judicial estoppel arguments, however, the Court disagrees. Collateral estoppel or issue preclusion forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit. *CSX Transp., Inc. v. B.M.W.E.*, 327 F.3d 1309, 1317 (11th Cir.2003). For the doctrine of collateral estoppel to apply, (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical or necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *Id.* (citing *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir.1986)). LMC argues that the issue of the correct settlement amount in the Hawkins Lawsuit is identical to the issue actually litigated in Michigan court and addressed by Judge Battani when she discharged Norman Yatooma's attorney's lien on any amounts in excess of $2 million; that Judge Battani's ruling was a critical part of the judgment in the Hawkins Lawsuit; and that BKC had a full and fair opportunity to be heard in connection with the discharge of the attorney's lien, but that it failed to object. In the alternative,

---

7. The Court addresses these issues only because the parties gave them such extensive consideration in their briefings, and because, in the event of an appeal, this discussion provides additional bases for a limitation on

BKC's coverage under the LMC Policy. However, as noted above, the Court's ruling with respect to the "clear and unambiguous" language of the Policy's coverage provisions is dispositive of this case.

LMC argues that the doctrine of judicial estoppel, which "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," applies. *See Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

■ Upon review of the applicable case law, the Court finds that neither collateral nor judicial estoppel would apply in this case. First, collateral estoppel cannot apply because the issue before Judge Battani—the appropriate amount for Mr. Yatooma's charging lien—is not identical to the issue in this case—the proper value of the settlement for which coverage should be afforded under the LMC Policy. Second, although BKC was present at the hearing on the charging lien issues, BKC had no interest or stake in the proceedings regarding Mr. Yatooma's attorneys' fees and therefore, had no reason to voice any objections at the hearing. Third, judicial estoppel is only "applied to the calculated assertion of divergent sworn positions ... and is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *Dockery v. North Shore Med. Ctr.,* 909 F.Supp. 1550, 1558 (S.D.Fla. 1995). Again, BKC had no interest in the motion to resolve charging lien. BKC did not, therefore, take any position regarding the amount of the charging lien. Because LMC cannot demonstrate that BKC or its officers took an inconsistent position, under oath, with respect to the value of the settlement, judicial estoppel could not apply.

## IV. CONCLUSION

Based on the foregoing reasons, it is hereby

ORDERED that:

(1) Defendant Lumbermens Mutual Casualty Company's [DE–96] Motion for Summary Judgment [DE–96] is GRANTED. Defendant shall be awarded case dispositive summary judgment on Plaintiff's claims for breach of contract and declaratory judgment;

(2) Plaintiff Burger King Corporation's Cross Motion for Summary Judgment [DE–116] is DENIED;

(3) BKC's Motion to Strike Specific Paragraphs of the Affidavit of Todd. S. Schenk Filed by Defendant LMC in Support of Their Motion for Summary Judgment [DE–115] is DENIED;

(4) All pending motions are DENIED AS MOOT; and

(5) This case is CLOSED.